IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
NOVEMBER 1999 SESSION

## STATE OF TENNESSEE v. LETIVIAS PRINCE

**Direct Appeal from the Circuit Court for Williamson County**
**No. I-497-141   Donald P. Harris, Judge**

---

**No. M1998-00005-CCA-R3-CD - Filed August 10, 2000**

---

The defendant, Letivias Prince, was convicted of first degree murder and was sentenced to life imprisonment. On appeal, the defendant argues that the jury pool did not adequately represent the racial makeup of the community; that pre-trial publicity deprived him of a fair trial; that the trial court erred by permitting eight peremptory challenges in jury selection; that the trial court erred by allowing the state to either call a rebuttal witness or receive a missing witness instruction; that the trial court erred by instructing the jury regarding the order of consideration of offenses; and that the evidence was insufficient to sustain his conviction. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed.**

GARY R. WADE, P.J., delivered the opinion of the court, in which JOHN H. PEAY and NORMA MCGEE OGLE, JJ., joined.

Mark C. Scruggs, Nashville, Tennessee, for the appellant, Letivias Prince.

Paul G. Summers, Attorney General and Reporter, Lucian D. Geise, Assistant Attorney General, Joseph Baugh and John Barringer, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The defendant, Letivias Prince, was convicted of first degree murder in the shooting death of Richard Clinton Fly. Tenn. Code Ann. § 39-13-202. The trial court sentenced the defendant to life imprisonment. In this appeal of right, the defendant presents the following issues for review:

> (1) whether the defendant was deprived of a fair trial because the jury did not represent a fair cross-section of the community due to the systematic exclusion of blacks from the jury pool;
>
> (2) whether pretrial publicity surrounding the defendant's trial deprived him of a fair trial;

(3) whether the trial court erred by allowing the defendant eight peremptory challenges in the jury selection process;

(4) whether the trial court erred by allowing the state to choose between a missing witness instruction or calling a rebuttal witness;

(5) whether the trial court erred by instructing the jury regarding the order of consideration of offenses; and

(6) whether the evidence of premeditation was sufficient to support his conviction.

Because we find no reversible error, the judgment of the trial court is affirmed.

At approximately 10:30 P.M. on March 8, 1997, Joel Dickerson, directed by the victim, Ricky Fly, drove to an area of Franklin to purchase crack cocaine. After circling the block several times, they stopped at a street corner to ask a "large black man" for a "twenty." When the man responded that there was "nothing going on," they drove away. As they approached the intersection of Glass and Eleventh, Dickerson heard between four and six successive gunshots which seemed to be coming from some bushes behind his truck. Fly was struck in the back of the head by a bullet which came through the rear window. Dickerson drove to a nearby gas station and called 911. Neither Dickerson nor the victim were armed. Dickerson did have a small pocket knife stored in his glove compartment.

Police immediately identified the defendant as a suspect. Several hours later, he was found hiding in a vehicle. The defendant initially denied any involvement in the shooting, but later took officers to the crime scene and admitted that he had fired at the truck.

When interviewed by the police, the defendant stated that two white men in a truck had driven through the area asking for crack cocaine. The defendant stated that he and his companions had informed the men that they did not sell drugs. He claimed that the two men threatened to shoot them and then drove away. He contended that the two men came around the block again and appeared to be throwing bottles from the truck. The defendant told police that he shot at the truck in order to frighten the men. He claimed that after he fired the shots, he took the weapon to his home and hid it under a mattress. The police recovered a Lorcin .380 semiautomatic pistol from the defendant's step-grandfather at the defendant's residence.

At the trial, Marcus Cannon, who was standing at the corner of Glass Street and Ninth Avenue, testified that the men in the truck also asked him to sell them some drugs. He claimed that when he informed them that he had none, they threatened to kill someone. Cannon contended that he warned the defendant and his friends about the two men. Defense witnesses claimed that the two men in the truck turned off the lights as if to do a "drive by shooting" on their third trip around the block.

Dickerson's truck contained four different bullet holes. Two bullets were imbedded in the truck, one in the passenger door, and another in the left rear wheel well. One bullet and seven lead bullet jackets were recovered from the scene of the shooting. The state's expert testimony established that all three bullets and four of the seven shells had been fired from the Lorcin .380 pistol. The other three shells were very close to a match. Other than Dickerson's small pocket knife located in the glove compartment, there were no weapons in the truck.

I

The defendant, who is African-American, argues that he was deprived of his right to a fair trial through the "systematic exclusion of blacks from the jury pool in Williamson County, Tennessee." His contention is that "the lack of blacks within the jury pool almost guaranteed" his conviction.

The statistics contained in the record regarding Williamson County reveal that in 1997, African-Americans made up approximately five percent of the drivers' license pool. The overall percentage of African-Americans in the general population in 1996 was seven percent. It is the defendant's position that a broader statistical base should have been used from which his jury was selected. The defendant insists that the venire should have encompassed nearby Davidson County, which is 25 percent African-American, so that he had "a fair cross-section of the community in selecting a jury." As support of his claim, the defendant submitted the affidavit of a black juror, who swore that the racial composition of the jury had an effect on the disposition of the case.

Article I, Section 9 guarantees all criminal defendants a right to a jury from "the County in which the crime shall have been committed." See State v. Upchurch, 620 S.W.2d 540, 542 (Tenn. Crim. App. 1980) (stating that "an accused must be tried in the county in which the crimes are alleged to have been committed."). Moreover, a criminal defendant has a constitutional right to a jury drawn from a venire that represents a fair cross-section of the community. "[S]election of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial." State v. Bell, 745 S.W.2d 858, 860 (Tenn. 1988) (citing Taylor v. Louisiana, 419 U.S. 522 (1975)). In Duren v. Missouri, 439 U.S. 357 (1979), the United States Supreme Court listed the criteria for establishing a prima facie violation of the requirement of a fair-cross section:

> (1) the group alleged to be excluded is a "distinctive group" within the community;

> (2) the representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

> (3) this underrepresentation is due to systematic exclusion of the

group in the jury selection process.

Id. at 364; see also State v. Buck, 670 S.W.2d 600, 610 (Tenn. 1984); Adkins v. State, 911 S.W.2d 334 (Tenn. Crim. App. 1995), app. dismissed (Tenn., Aug. 25, 1995).

Clearly, the African-American population of Williamson County represents a distinctive group in the community. The defendant, however, has not established that the representation of African-Americans on the venire from which his jury was selected was unfair or unreasonable. Likewise, there is no showing that the jury selection process in Williamson County resulted in underrepresentation of blacks due to systematic exclusion.

The record indicates that in 1996, seven percent of the total Williamson County population was African-American. One year later, at the time of the defendant's trial, African-Americans made up five percent of the drivers' license pool from which jurors were drawn in Williamson County. In his brief, the defendant estimates that only five of the 60 to 75 potential jurors were black. Based upon the defendant's own estimates, African-Americans on the venire ranged between 6.6 and 8.3 percent, a fair representation of the county as a whole. Notwithstanding these figures, the defendant argues that the Williamson County trial court should have attempted to achieve a higher ratio of black potential jurors by drawing from Davidson County, a bordering county, but one outside of "the community," by the traditional definition. The defendant has not cited, nor has this court found, any authority for such a proposition. In our view, the trial court's procedures did not systematically exclude the black segment of the population and the jury venire represented a statistically appropriate cross-section of the Williamson County community.

II

Next, the defendant argues that pretrial publicity, including several newspaper articles which were published in the days leading up to his trial and which included his prior criminal record, deprived him of a fair trial. The defendant cites no legal authority for his argument. He merely argues that it "would not have been humanly possible for the prospective jurors to have not either read or heard about . . . the Defendant's criminal record prior to the commencement of the trial." The defendant did not include copies of the newspaper articles in the record. Moreover, the defendant did not move the trial court for a change of venue, which would have been the proper remedy in the event of excessive pretrial publicity. State v. Nichols, 877 S.W.2d 722 (Tenn. 1994).

As previously stated, Article I, section 9 of the Tennessee Constitution guarantees "the right . . . to a speedy public trial . . . [by] an impartial jury." "The challenge for cause was designed to exclude from the jury triers whose bias or prejudice rendered them unfit . . . ." Manning v. State, 155 Tenn. 266, 292 S.W.2d 451, 455 (1927). Rule 24(b) of the Tennessee Rules of Criminal Procedure provides that "[i]f the trial judge, after examination of any juror, is of the opinion that grounds for challenge for cause are present, the judge shall excuse that juror from the trial of the case." A party may challenge a prospective juror for cause if the "prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror." Tenn. R. Crim. P. 24(b)(2). The

rule further provides as follows:

> Both the degree of exposure and the prospective juror's testimony as to his or her state of mind shall be considered in determining acceptability. A prospective juror who states that he or she will be unable to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptablitity shall depend on whether the testimony as to impartiality is believed. If the prospective juror admits to having formed an opinion, he or she shall be subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

Id. Juror qualification rests within the discretion of the trial court and "the trial judge's finding a juror to be qualified will not be disturbed on review except on the clear showing of an abuse of discretion." Burns v. State, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979).

Although jurors may be excluded for cause if they have formed an opinion which will prevent impartiality, "[j]urors need not be totally ignorant of the facts of the case on which they sit [and even] the formation of an opinion on the merits will not disqualify a juror if [the juror] can lay aside [his or her] opinion and render a verdict based on the evidence presented in court." State v. Howell, 868 S.W.2d 238, 249 (Tenn. 1993). The United States Supreme Court has made the following observation:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

Irvin v. Dowd, 366 U.S. 717, 722-23 (1961). Thus, so long as a juror may set aside any previously formed opinions and render a verdict based upon the evidence presented in court, the juror may properly sit on the case. Id.

Here, the trial judge allowed extensive voir dire. Further, any juror who acknowledged having heard or read about the case was individually questioned by the judge, the prosecution, and

defense counsel. Each juror stated that he or she had not formed an opinion about the case. In light of their assurances of impartiality, the fact that some of the jurors previously had heard or read about the defendant does not disqualify them from participation. In our view, the trial court did not abuse its discretion by its approval of the jury panel.

III

Next, the defendant contends that the trial court erred by allowing only eight peremptory challenges. The defendant asserts that the plain language of the statute entitles him to 15 peremptory challenges. Specifically, he points to the language of the statute which states that a defendant "charged with an offense punishable by death" is entitled to 15 peremptory challenges.

Tenn. Code Ann. § 40-18-118 provides:

**Peremptory challenges**.– Notwithstanding any other provision of law or rule of court to the contrary, in any case in which a defendant is <u>charged with an offense punishable by death</u>, such defendant is entitled to fifteen (15) peremptory challenges and the state is entitled to fifteen (15) peremptory challenges for each such defendant. If the offense charged is punishable by imprisonment for more than one (1) year but not by death, each defendant is entitled to eight (8) peremptory challenges, and the state is entitled to eight (8) peremptory challenges for each defendant. If the offense charged is punishable by imprisonment for less than one (1) year or by fine, or both, each side is entitled to three (3) peremptory challenges for each defendant.

Tenn. Code Ann. § 40-18-118 (emphasis added).

In <u>State v. Atkins</u>, 681 S.W.2d 571 (Tenn. Crim. App. 1984), <u>cert. denied</u>, 105 S. Ct. 1395 (1985), this court concluded that where the death penalty is not to be submitted for the jury's consideration, the defendant is entitled to only eight peremptory challenges. Because the state did not seek the death penalty in this case, the trial court did not err by permitting the defendant only eight peremptory challenges.

IV

The defendant next contends that the trial court erred by allowing the state the opportunity to either call its ballistics expert, Steve Scott, as a rebuttal witness or receive the benefit of a missing witness jury instruction due to the failure of the defendant's ballistics expert, Robert Goodwin, to testify.

The evidence offered by the state established that the victim was killed by a bullet fired from

a large caliber pistol, such as a .380. A Lorcin .380 was recovered from the defendant's residence. The state's ballistics expert testified that the bullet found in the area of the shooting and the bullets found embedded in the truck in which the victim was riding were fired from the defendant's gun. A defense witness, Rena Prince, testified that Marcus Cannon asked her to hold a "similar" pistol sometime after the shooting on the night of the crime. She claimed that Cannon's pistol was not the same as that recovered from the defendant's residence. According to Ms. Prince, she was at the American Legion Club near the women's room when Marcus Cannon entered the club followed by the police. She testified that as officers moved closer to Cannon, he ran to her, and handed her a gun, saying, "Auntie, take this." She put the gun in her pocket and held it for Cannon for approximately five minutes. Cannon then retrieved the gun and left through the back door. Ms. Prince described the gun given to her by Cannon as being black, heavy, and having a length of approximately five inches long. The gun given to her by Cannon was not the same gun put into evidence by the state. It was simply described as "similar."

Upon the close of the defendant's proof, the state sought to rebut the testimony of Rena Prince, which it characterized as "placing another gun at the scene." Initially, the state attempted to introduce the agreed order allowing the defendant's ballistics expert to access the state's ballistics-related evidence. The defense objected, however, and the trial court sustained the objection. Although the state suggested several other possible courses of action that it believed to be available for purposes of rebutting Ms. Prince's testimony, the only one entertained by the trial court was a missing witness jury charge. The state offered to recall its own ballistics expert, Steve Scott, to testify that the defendant's ballistics expert had indeed tested the ballistics evidence at the TBI facilities and that he was within the range of the court's subpoena power, thereby establishing a foundation for the missing witness charge. When the trial court indicated that it would allow the state to recall Scott to establish the basis for the instruction, defense counsel offered to stipulate the anticipated testimony. The trial court read the stipulation into the record and ultimately provided the jury with a missing witness charge.

Rebuttal evidence, defined as that "which tends to explain or controvert evidence produced by an adverse party," is admissible within the discretion of the trial court. Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979); see State v. Yarbro, 618 S.W.2d 521, 525 (Tenn. Crim. App. 1981). "Whether [evidence] is rebuttal [evidence] is not determined by the order in which [it is presented]. This determination is based upon the content of the evidence offered." State v. West, 825 S.W.2d 695, 698 (Tenn. Crim. App. 1992). "The rationale behind [the rule] is ⊲[s]ince the state does not and cannot know what evidence the defense will use until it is presented at trial, the state is given the right of rebuttal.'" State v. Cyrus Deville Wilson, No. 01C01-9408-CR-00266 (Tenn. Crim. App., at Nashville, Nov. 15, 1995) (citing Johnson v. State, 469 S.W.2d 529, 530 (Tenn. Crim. App. 1971)). The scope of rebuttal testimony usually lies within the discretion of the trial court. Beasley v. State, 539 S.W.2d 820, 824 (Tenn. Crim. App. 1976). Trial courts may properly permit the state to introduce testimony in rebuttal which should have been introduced in their proof in chief. Johnson, 469 S.W.2d at 530.

The missing witness rule provides that when there is "⊲a reasonable assurance that it would have been natural for a party to have called the absent witness but for some apprehension about his

[or her] testimony,' an inference may be drawn by the jury that the testimony would have been unfavorable." State v. Francis, 669 S.W.2d 85, 89 (Tenn. 1984) (quoting Burgess v. United States, 440 F.2d 226, 237 (D.C. Cir. 1970)). This rule was established in Graves v. United States, 150 U.S. 118 (1893). While the original rule in Graves created a presumption of the unfavorability of the testimony, the rule is now generally characterized as authorizing a permissive inference. Francis, 669 S.W.2d at 88; see also State v. Jones, 598 S.W.2d 209, 224 (Tenn. 1980). In Delk v. State, 590 S.W.2d 435, 440 (Tenn. 1979), our supreme court held that a party may comment about an absent witness when the evidence shows as follows:

> (1) the witness had knowledge of material facts;
>
> (2) that a relationship exists between the witness and the party that would naturally incline the witness to favor the party; and
>
> (3) that the missing witness was available to the process of the trial court.

These requirements are to be "strictly construed, particularly when the rights of a criminal defendant may be affected." Francis, 669 S.W.2d at 89.

Rena Prince's testimony was offered by the defense to imply that Cannon might have fired the fatal shot. The stipulation that Robert Goodwin had tested the defendant's weapon, coupled with his failure to testify, was presented to rebut any possible inference drawn by the jurors. Because, however, the "missing witness" was a ballistics expert, his testimony would have related to his opinions as to the weapon used in the shooting and whether the pistol recovered from the defendant's home was the same weapon used in the shooting. This testimony does not meet the first criteria listed in Delk. That is, the expert witness did not have knowledge of "material facts" relative to the shooting. Instead, he had formed opinions based upon his knowledge in the field of ballistics and his examination of the weapons and ammunition. See Tenn. R. Evid. 703 (stating that experts in scientific or technical fields may testify in the form of an opinion).

Additionally, it cannot be said that an expert will always be naturally inclined to favor the party who hires him, as required by the second Delk criteria. Although an expert may be more likely to testify if his views are consistent with the theory of his employer, "we are not convinced that an expert's testimony must somehow be a commodity bought and sold to reflect exactly what a party might wish or direct." Taylor v. Kohli, 625 N.E.2d 64, 68 (Ill. Ct. App. 1993). It was, therefore, erroneous for the trial court to provide a missing witness instruction relative to the ballistics expert. Were we to hold otherwise, any expert witness not called upon to testify for the state or the defense would entitle the other side to a missing witness instruction. Parties might be disinclined to hire consulting, non-testifying experts for fear that their absence might result in a negative inference. In our view, that is not the intention of the missing witness rule. Our research does not indicate any other Tennessee case in which the missing witness rule was applied under similar circumstances. An Indiana appellate court, reviewing a trial court's refusal to issue a missing witness instruction under similar circumstances, stated the following:

-8-

> Refusing the instruction was not reversible error. The court is invested with discretion in determining the final instructions to be given to the jury. Our prior decisions have disapproved the giving of such "missing witness" instructions unless clearly required by the evidence. We find it unrealistic to impose on litigants the necessity of calling as witnesses every expert whom they may have consulted at some stage of the proceedings or suffer a missing witness instruction when the case goes to trial.

Bitzer v. Pradziad, 571 N.E.2d 593, 597 (Ind. Ct. App. 1991) (citations omitted).

Furthermore, the record provides us with no information to assess the admissibility of the "missing" ballistics expert's testimony. The only reference in the record to the defendant's ballistics expert comes from the agreed order, wherein the state and the defense stipulated that Goodwin would be permitted to test the weapon at the TBI laboratory. In the absence of any information about Goodwin's education or training, this court is unable to conclude that he would have qualified as an expert in the field of ballistics under Tenn. R. Evid. 701. It is, therefore, our conclusion that the trial court erred by providing a missing witness instruction relating to the ballistics expert.

Although the trial court erred by instructing the jury regarding the missing witness, the state is entitled to a harmless error analysis. See Francis, 669 S.W.2d at 90. A reversal is required if the error affirmatively appears to have affected the result of the trial on the merits. Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). The proof of the defendant's guilt was substantial. The weapon located at the defendant's home matched the bullets and casings recovered from the scene of the shooting and the bullets recovered from the truck. In contrast, the testimony of Rena Prince provided little assistance to the defense theory. It merely suggested that another gun might have been present at the scene of the crime. There was no indication that it had been fired. Moreover, the defendant admitted to shooting at the truck. In our assessment, the missing witness jury instruction was harmless error.

V

Next, the defendant contends that the trial court erred in its instruction to the jury relative to the order of consideration of offenses. The trial court charged the jury on first degree murder, and the lesser included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. In conformity with Tennessee Pattern Jury Instruction Criminal 41.01, the trial court instructed the jury to first consider whether the defendant was guilty of first degree murder before proceeding to the lesser included offense of second degree murder, and to continue in that manner until reaching a verdict. Tennessee Pattern Jury Instruction Criminal 41.01 provides as follows:

> If you have a reasonable doubt as to the defendant's guilt of _____ (insert offense charged) as charged in the indictment, then

your verdict must be not guilty as to this offense, and then you shall proceed to determine [his][her] guilt or innocence of the lesser included offense of _____ (insert lesser included offense).

The defendant now argues that the court's instructions to first consider first degree murder "gave more weight to the charge of first degree murder, invaded the province of the jury regarding the manner in which their deliberations were to be conducted, and effectively prevented the jury from considering all possible convictions."

This court has previously rejected similar arguments. In State v. Rutherford, 876 S.W.2d 118 (Tenn. Crim. App. 1993), app. denied (Tenn., Feb. 14, 1994), the defendant argued that the sequential nature of the charge prevented the jury from determining the degree of homicide shown by the evidence. A panel from this court concluded as follows:

> The jury does have a duty to determine the grade of the offense, but the "sequential" instruction was not violative of this duty under Tennessee law. The judge instructed the jury on all of the lesser offenses included in the charge of first degree murder as required by statute. The sequential jury instruction did not preclude the jury from considering the lesser charges.

Id. at 119 (citations omitted); see also State v. Robert Williams, No. 03C01-9302-CR-00050 (Tenn. Crim. App., at Knoxville, Apr. 2, 1996). This issue, therefore, is without merit.

VI

As his final issue, the defendant argues that the evidence was insufficient to support his conviction for first degree murder. Specifically, he contends that the evidence did not support a finding of premeditation.

On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978). The credibility of witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). In a criminal case, a conviction may be set aside only when the reviewing court finds that the "evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). A guilty verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all conflicts in testimony in favor of the state's theory. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978). A verdict against the defendant removes the presumption of innocence and raises a presumption of guilt upon appeal. State v. Grace, 493 S.W.2d 474 (Tenn. 1973).

First degree murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "'[P]remeditation' is an act done after the exercise of reflection and

judgment" and requires that the "intent to kill [be] formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). While the intent to kill must have been formed prior to the act itself, "[i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). One authority provides some insight into the nature of proof required before a jury might properly infer premeditation:

> (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity;
> (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and
> (3) facts about the nature of the killing from which it may be inferred that the manner of the killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 LaFave & Scott, Substantive Criminal Law § 7.7; see also State v. Jones, 15 S.W.3d 880, 888-89; State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Premeditation is a question for the jury and may be inferred from the manner and circumstances of the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993).

The evidence here established that the defendant, rather than leaving the scene, armed himself and hid in some bushes while waiting for the truck to drive by. The defendant fired at least seven different times from his semiautomatic weapon into a truck containing two unarmed passengers. The shot that killed the victim entered from the rear of the truck, striking the victim in the back of the head, thereby indicating that the truck was already past the defendant when he fired the fatal shot. The defendant was found hiding in a car after the shooting. He admitted that he intended to fire his weapon at the truck. The jury was given a self-defense instruction, but rejected that theory, finding instead that the defendant had intentionally and with premeditation shot and killed the victim. This evidence, accredited by the jury, is sufficient to prove the elements of the crime.

Accordingly, the judgment of the trial court is affirmed.

        _____
        GARY R. WADE, PRESIDING JUDGE