# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 18, 2010

## JOHNNY M. BURROUGHS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Dickson County**
**No. CR-9436    Robert E. Burch, Judge**

---

**No. M2009-01466-CCA-R3-PC - Filed November 16, 2010**

---

A Dickson County jury convicted the Petitioner, Johnny M. Burroughs, of felony murder, especially aggravated robbery, and theft of property over $1000, and it imposed a life sentence for his murder conviction. The trial court sentenced him to twenty years for his robbery conviction and to two years for his theft conviction, to be served concurrently with his life sentence. On direct appeal, this Court affirmed the Petitioner's convictions and sentence. The Petitioner then filed a petition for post-conviction relief, claiming he received the ineffective assistance of counsel, which the post-conviction court dismissed after a hearing. On appeal, the Petitioner contends the post-conviction court erred when it dismissed his petition. After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Mitchell B. Dugan, Dickson, Tennessee, for the Appellant, Johnny M. Burroughs.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Clarence E. Lutz, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; Suzanne Lockert-Mash, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
#### A. Background

On the Petitioner's direct appeal, this Court set forth the following factual summary of the events underlying the Petitioner's convictions:

On May 3, 2003, Paul Totty and Grandville Johnson were hunting in the woods in Hickman County when they discovered a red Nissan truck. The next day, the two men noticed that the truck had been set on fire. The truck was also seen smoldering by Robert Allen Orton. Mr. Orton called 911 to report what he found in the woods.

The police were dispatched to the location of the burning truck and soon discovered that the truck belonged to Jean Bowen, the victim. The victim lived in Dickson County. According to her sister, Nell Brown, the two women were supposed to have a picnic on May 2, 2003. Ms. Brown became concerned when her sister did not show-up for the picnic and called Sandra Parker, the victim's daughter. When Ms. Parker drove by her mother's house, she noticed that her mother's red Nissan truck was not parked in the driveway and assumed that her mother was out running errands or visiting someone.

On May 4, 2003, after the authorities confirmed that the truck belonged to the victim, Peter Rogers, a Deputy Sheriff with the Dickson County Sheriff's Department, was dispatched to the victim's house. Deputy Rogers noticed what he thought were "spots of blood" on the front porch. Deputy Rogers knocked on the door, but received no response. When Deputy Rogers looked through the window on the front porch of the small farmhouse, he could see the victim lying in a pool of blood. Without entering the house, Deputy Rogers could tell that the victim was "deceased" because "her body was stiff, real ridged like" and "the blood on her was almost a black or a purple color and you could tell it was dry."

The victim's body was found in the kitchen of the house, lying on the floor next to the freezer. There was blood spattered on the freezer and the wall. After talking to the victim's daughter, the authorities were able to determine that the victim's purse and shotgun were missing in addition to the victim's red Nissan truck. There were no identifiable latent finger prints recovered from the scene of the crime.

According to the medical examiner, the victim died as a result of multiple injuries, including "extensive skull fractures, facial bone fractures," contusions to the brain and blunt force injuries to the torso. Several of the

2

injuries to the face and head were consistent with being struck with a hatchet.

During the investigation, the authorities received information that the victim's nephew, Greg Smith, had tried to borrow money from the victim and that he became upset when she refused to give him money. The appellant was one of Greg Smith's close friends.

On the evening of May 15, 2003, the appellant along with Greg Smith and Vicki Spicer, the two co-defendants, visited Dwight Eric Halbrooks's home in Hickman County. The appellant came to the house to sell Mr. Halbrooks a shotgun that the appellant claimed he got from his father. [The shotgun actually belonged to the victim.] The appellant also offered to sell Mr. Halbrooks a red Nissan that was stolen in Dickson. Mr. Halbrooks bought the gun for twenty-five dollars, but declined to buy the truck.

After hearing about the robbery and murder in Dickson County, Mr. Halbrooks had his nephew hide the shotgun, thinking that it might be the murder weapon involved in the news reports. Mr. Halbrooks later turned the gun over to agents from the Tennessee Bureau of Investigation.

On May 15, 2003, Agent Douglas Long of the Tennessee Bureau of Investigation went with Detective B.J. Gafford of the Dickson County Sheriff's Department to the trailer park in Centerville, Tennessee where the appellant lived. The two officers approached the appellant and asked him to come in and give a statement. The appellant complied by riding in the car with the officers to the Criminal Justice Center in Hickman County. Prior to the statement, the officers obtained a waiver of rights from the appellant and informed him of his Miranda rights.

The appellant's statement reads as follows:

On Friday night, May 2, 2003, me and Greg Smith were riding around in Marenda Campbell's blue Thunderbird. It was around 8:00 p.m. and we were driving down I-40 heading west. He and I had been riding around Dickson. As we were coming down the interstate, I was driving and we noticed that the car was running hot. The engine was about to shutdown because it was running so hot. Greg told me to pull off the exit, so I did. We turned left and went back over the interstate and pulled over at the stop sign at the top of the hill. We both get out of the car

and raised the hood. We're checking the radiator and then go to the trunk to see if there is any water. Greg then grabbed the one-way lug wrench. He tells me he has an aunt that lives close by. We could see the house from where we were. We start walking towards her house. As we are walking towards her house, he started telling me that he was going to jail for four or five years because he had failed a drug test. He was on probation for stealing a toolbox. He said he wanted to rob her, take her money. He kept saying she had a bunch of money. He said that he wanted to give the money to his girlfriend so she could pay rent while he was in jail.

When we got to the house, the street light was on, and the porch light was on. Greg knocked on the door and she came to the door and opened the wooden door. The screen door was closed. Greg tells her who he is and that he needs water for his car that was parked up the street. She tells us to come in and she opens the door. Greg goes in first and I follow him. The lug wrench is either in his back pocket or stuck in the back of his pants. While we were standing in the living room, he tells her he needs a big jug to put water in. They go into the kitchen. The doorway to the kitchen was to my right as I stood in the living room. The TV was to my right and the couch was in front of me. When Greg and her went into the kitchen, I heard Greg say something about a jug and then heard some commotion. It sounded like somebody fell on some pots and pans. It sounded like something kept hitting pans. I heard this sound five to six times. I was standing in the living room looking around. Greg is in the kitchen for a minute to a minute and a half. As he comes out of the kitchen, he has the lug wrench in his hand. When he came out of the kitchen, he went over to the couch and grabbed a brown paper bag that had her purse inside. I don't know what happened to the paper bag. After he grabbed the purse he turns to me and says let's go. I don't remember if he went anywhere else in the house. As we go towards the door, he is in front of me. He sees the shotgun in the corner next to the door. He grabbed the shotgun and goes outside the house, with me following him. He has the purse, shotgun, and lug wrench in his hand. I think he was carrying the purse and shotgun in his left hand and the lug wrench in his right hand. Greg is right

4

handed.  As we leave the house, I turn and head for the street and he goes for the truck.  The truck is parked in the carport to the right of the house as you look at it.  As I am running up the hill, he passes me in a red Nissan.  The truck had a toolbox behind the cab.

When I got to the top of the hill, I closed the hood and the trunk and got in.  Greg was already on the interstate.  I get on the interstate and start heading towards the Turney Center exit.  I'm driving about 85 to 90 trying to catch him.  I finally see him about a mile before the Turney Center exit.  He had pulled over waiting on me.  He pulls out and gets off the exit.  I follow him off the interstate.  When we get to the top of the exit we take a left [and] start driving down the new highway.  We finally turn right on the backside of Beaver Dam Road.  We drive down the road and finally turn left onto an old logging road.  I follow him a little ways, until there is an open spot.  I didn't go any further because I would have bottomed out.  Greg drove the truck back away's [sic] through some mud holes.  He is gone for about 10 minutes and comes back.  He parked the truck facing me, facing the way we came in.  He has the driver's door open and begins throwing stuff out while he is standing outside the door.  He threw out the brown console cup holder, some papers, a bunch of blank checks, a yellow folder, a U.S. coin collector's kit.  I was standing in front of the truck during this.  He reached behind the seat and grabbed the shotgun.  I'm not for sure what he did with the lug wrench, he may have thrown it in the woods.  After he grabbed the shotgun he gave it to me.  The shotgun was a 20 gauge single shot.  I put it in the trunk of the car.  At that time he was going through the purse.  He got her money.  I think it was about $60.00.  He got a ring and it had a blue setting in it.  He also got a silver watch or bracelet.  He left the purse in the truck.  We got in the car and left.  I was driving at that time.  We went to the trailer park.  It was around 12:00 to 12:30.  I went to my trailer and he went to his.

Saturday mor[n]ing around 11:30 Greg and I left in Marenda's car.  We went to Eric Highbrooks [sic] house on Bear Creek.  We went up to the door and asked him if he wanted to buy the shotgun.  He asked what kind and I told him it was a 20 gauge.

5

He agreed and gave us a 20 sack of weed. We left and went back to the trailer park and smoked it. We hung around the trailer park most of the day. Later that evening, almost dark, Greg came over asking if I knew anybody that would by [sic] the truck and I told him no. He said he had to get rid of the truck. As we were walking around, he said something about burning it and I said that I had a gas can. My gas can is a one gallon can. It's plastic and red. I gave him the gas can and he said he was going to burn the truck. Later that night the Thunderbird was gone, so I assumed that he had gone to burn the truck. I didn't see Greg until Sunday evening.

On Sunday evening Marenda's dad came over and said they found the truck burnt where he worked. I guess he does some kind of logging. On Monday or Tuesday Greg came and started talking about what happened and I told him I didn't want to talk about it. I was trying to forget about it.

The appellant also made two supplements to his statement. In the first supplement, the appellant stated the following[:]

I think Greg still has the ring and the watch or bracelet. I saw him stick the ring and bracelet in his pocket. It was already in a paper towel.

Greg was wearing blue jeans and a white T-shirt and a black baseball hat that may have some racing [sic] on it. She was wearing blue jeans. I don't remember what type of shirt she was wearing.

I don't know where he got the keys to the truck. As I was going towards my car, I had passed the 1st stop sign and was halfway up the hill when he passed me in the truck.

The second supplement read as follows:

[Vicki stayed] with the car while it was parked at the CB shop. She did not go to the house with me and Greg to rob Greg's aunt. When I got back to the car she was still waiting with the car. Vicki did not know what had happened at that time and I

6

did not tell her what happened.  She did not know that Greg's aunt was dead until she heard the news later.

I was in the truck the night the truck was burned.  Greg and I drove Greg's girlfriends [sic] car, a blue Thunderbird.  I was driving the car and Greg was riding as a passenger.  I cannot remember if Vicki was with us.  We drove back up to where we had left [sic] the truck on the logging road.  Before we burned the truck I drove the truck and Greg drove it.  I wrecked it maybe twice.  I did the damage to the bed by backing the truck up into a tree and by sideswiping a tree.  I was in the truck by myself when I wrecked it.  Greg also wrecked the truck and did damage to it.  The wrecking and burning the truck took place sometime between 11:30 p.m. and 12:00 a.m. on Saturday, May 3, 2003.

While inside Greg's aunt's house, both Greg and I saw her still moving after Greg had already hit her and she was laying on the floor.  Greg went back over to where she was laying on the floor and hit her with the one-way lug wrench 2 or 3 more times in the head.

*State v. Johnny M. Burroughs*, No. M2005-00900-CCA-R3-CD, 2006 WL 643161, *1-4 (Tenn. Crim. App., at Nashville, Mar. 9, 2006), *perm. app. denied* (Tenn. Aug. 21, 2006).

Based upon the events outlined above, a Dickson County grand jury indicted Greg Smith, the Petitioner, and Victoria Spicer for first degree murder, conspiracy to commit first degree murder, especially aggravated robbery, conspiracy to commit especially aggravated robbery, theft of property over $1000, and conspiracy to commit theft over $1000.  Smith pled guilty and was sentenced, and the Petitioner pled not guilty and proceeded to trial.  At the close of the State's proof, the trial court granted the Petitioner's motion for judgment of acquittal as to the conspiracy counts.  The defense rested on the State's proof.  After deliberating, the jury convicted the Petitioner of felony murder, especially aggravated robbery, and theft of property over $1000 and imposed a life sentence for his felony murder conviction.  The trial court sentenced him to twenty years for his robbery conviction and two years for his theft conviction, to be served concurrently to his life sentence.  The Petitioner filed a direct appeal, challenging the sufficiency of the evidence supporting his convictions and contending that double jeopardy barred his especially aggravated robbery conviction.  This Court affirmed his convictions.  *Burroughs*, 2006 WL 643161, *8.

7

## B. Post-Conviction

Following his direct appeal, the Petitioner timely filed a petition for post-conviction relief, and the post-conviction court appointed counsel, who amended the Petitioner's petition. The amended petition alleged, relevant to this appeal, that Counsel was ineffective for failing to: (1) object to improper comments made during the State's closing remarks; (2) file an "adequate" motion to suppress statements made by the Petitioner to police; (3) file an interlocutory appeal of the denial of the motion to suppress the Petitioner's statements; (4) call Greg Smith as a witness at trial; (5) request the jury be instructed on the lesser included offenses of facilitation of first degree murder and solicitation of first degree murder; (6) request that the jury be sequestered; (7) challenge the removal of an African-American from the jury; (8) request a change of venue; (9) obtain a pre-trial order preventing the jury from seeing the Petitioner with wrist and ankle restraints and dressed in an orange prison jumpsuit; and (10) present evidence at trial.

At the hearing on the petition for post-conviction relief, during Counsel's testimony, the Petitioner's post-conviction attorney introduced the trial transcript and had Counsel read aloud a portion of the State's closing remarks:

> [T]hey stole everything they could get including her truck and did it in the manner that you've heard described. That they took the property from the person of another by the use of violence; and they took the property intentionally and knowingly. What did they say when they walked down the hill, got to have some money. They accomplished it with a deadly weapon as I've described. They beat her to death.

Counsel did not specifically recall hearing the above remarks during closing arguments, which went without objection. He said he could recall no "tactical reasons" for not objecting to the remarks, acknowledging that, throughout his representation of the Petitioner, he had tried to distance his client from his co-defendant's acts, especially those of co-defendant Greg Smith. He likewise did not raise the remarks in the motion for new trial he filed on behalf of the Petitioner. Counsel acknowledged that either contemporaneously objecting to the remarks or raising them in the Petitioner's motion for new trial "would have been appropriate."

In order to understand the significance of the next portion of Counsel's testimony, we now summarize the Petitioner's statements to police. According to this Court's opinion on direct appeal, the Petitioner made one particularly detailed statement to police about his involvement in this case. This statement, however, did not indicate that the Petitioner agreed to help Smith rob the victim before the two entered her home. He made two addenda to this

8

statement, and one of these addenda suggested that the Petitioner agreed to rob the victim before he accompanied Smith into the victim's home. Counsel recalled that the Petitioner signed a waiver of his *Miranda* rights before he made the inculpatory statements. During the suppression hearing concerning these statements and their addenda, Counsel argued that, because the Petitioner was high on marijuana when he executed the waivers and gave the statements, the totality of the circumstances suggested he did not knowingly and voluntarily waive his *Miranda* rights. Counsel also argued that police should have re-*Mirandized* the Petitioner before he gave each of the addenda to his statement. Finally, he objected to the proposed plan of giving each juror a copy of the Petitioner's statement. The trial court denied the motion to suppress, and each juror was given a copy of the Petitioner's statement and its addenda.

At the post-conviction hearing, Counsel acknowledged that several circumstances surrounding the Petitioner's statement suggested that, at the time he gave the statements, he believed he was under arrest, when in fact he was not. Counsel explained, however, that he did not argue for the statements' suppression on this ground because, by this time, the Petitioner had already waived his *Miranda* rights, which would have cured any infirmity resulting from his false belief that he was under arrest. He likewise did not include this ground for the statements' inadmissibility in his motion for new trial.

Counsel explained that he did not file an interlocutory appeal of the denial of the motion to suppress the Petitioner's statements not only because he did not believe it was likely to be granted but also because he wished to preserve the Petitioner's ability to directly appeal the admission of his statements in the event the Petitioner was ultimately convicted.

Greg Smith pled guilty in June 2004, over five months before the Petitioner's trial. Counsel recalled that he and the Petitioner considered calling Smith to testify in hopes Smith would take full responsibility for the beating death of his aunt. These hopes were dashed, however, when they spoke with Smith's defense counsel, who warned them that Smith had "mental situations" that made him a "wild card." Counsel feared that Smith would testify that he and the Petitioner planned to rob the victim before they entered her house, which would bolster the State's argument that the Petitioner possessed the intent necessary to commit robbery and, thus, felony murder. As a result, Counsel never interviewed Smith and did not call him as a trial witness.

Counsel did not recall whether the trial court charged the jury with solicitation of murder and solicitation of especially aggravated robbery, which were lesser-included offenses of felony murder and especially aggravated robbery. He testified that the trial court did, however, charge the jury with respect to a facilitation theory of responsibility for these crimes.

9

Counsel testified that he decided to not ask the trial court to sequester the jury for two reasons: First, media coverage of the victim's killing had been limited. The local paper, as well as perhaps the paper of a neighboring county, ran only a few articles about the crime. He said this case received less media coverage than other cases he had been involved in. Second, Counsel said he wished to avoid attaching too much significance to the Petitioner's charges. He feared that asking for sequestration would lead the jury to believe the Petitioner was principally responsible for the victim's death whereas his aim was to persuade the jury that the Petitioner only minimally participated in the events surrounding the victim's death.

Counsel confirmed that he advised the Petitioner against testifying, despite the fact that the State's evidence against the Petitioner consisted mainly of the Petitioner's own statement. He explained he did so because, had the Petitioner testified, the State would have been able to introduce "horrible" testimony from witnesses who observed the Petitioner and Smith "giggle" and make sounds in the back of a squad car as they were being transported from Hickman County to Dickson County. Counsel had already gone to "painstaking" lengths to ensure this testimony was not independently admitted and did not want to open the door for the State to introduce the testimony.

Counsel did not recall whether any African-Americans appeared in the jury pool in the Petitioner's case. He said, however, no *Batson* challenge was made to its makeup. Counsel was familiar with the demographic profile of Dickson County and its surrounding counties.

Counsel explained that he did not request a change of venue for the Petitioner's trial because he believed for three reasons that Dickson County would prove more favorable for the Petitioner than Cheatham County, the venue he would likely receive if granted a change of venue. First, the Petitioner was more likely to receive a jury containing African-Americans in Dickson County. Second, juries in Cheatham County tended in his opinion to be more of the "convicting type." Third, the assistant district attorney general trying the State's case against the Petitioner hailed from Cheatham County.

Counsel confirmed he did not seek a pre-trial order preventing the Petitioner from being transported to court in jail jumpsuit and in prison shackles. He testified, however, that, before trial, he visited the Petitioner in jail to ensure he had alternative clothes to wear to trial. The Petitioner indicated to him that his family would bring him clothes to wear at trial. These arrangements apparently fell through, however, because the Petitioner arrived at court on the first day of trial shackled and dressed in his orange prison jumpsuit. Counsel and a colleague immediately left and purchased "street" clothing for the Petitioner, which the Petitioner changed into before he entered the courtroom. Counsel then arranged with the Sheriff's Department for the Petitioner, from that day forward, to arrive at court in street

clothes. Counsel was unsure whether the jury saw the Petitioner in his orange jumpsuit while the Petitioner sat in a holding cell before jury selection.

Counsel confirmed that he presented no evidence in defense of the Petitioner. He testified that he simply did not know of any witnesses whose testimony could aid the Petitioner's defense. He repeated his reservations about calling the Petitioner or his co-defendant Greg Smith, and he explained he did not call co-defendant Victoria Spicer because she was unlikely to "say anything" because she had not yet gone to trial on her charges. He acknowledged that his defense strategy was to attack the State's witnesses through cross-examination. Counsel testified that, in preparation for trial, he interviewed the State's witnesses, went to the scene of the crime, reconstructed the time line of the events, and interviewed witnesses who lived near the Petitioner. He explained that none of this investigation led to the discovery of any witness who would give testimony favorable to the Petitioner. Based on this paucity of defense material, Counsel elected to rely on the weakness of the State's evidence that the Petitioner entered the victim's home with the intent to rob or kill her. He stated:

> I didn't want any other witnesses to talk about [a] quote unquote plan or that this was a robbery. I want[ed] to leave it with what we had which was the one statement by [the Petitioner] that was written by a law enforcement officer and then he signed the statement; and I wanted to basically just be able to argue that; and I think I did argue that; but those weren't [the Petitioner's] words, that wasn't really his statement. Yeah, he had signed it but there was an addendum. That's what you want to try to explain to the jury, but I didn't need anybody else testifying that they knew of or had heard talk about there was going to be a supposed[] robbery.

On cross-examination, Counsel testified that he had been practicing for seven years when he tried the Petitioner's case and that he had tried several murder cases during his career. Counsel testified that he spoke with co-defendant Spicer's attorney before the Petitioner's trial and that she indicated Spicer would not be willing to offer "any testimony at all." He confirmed that both Spicer and Smith had given statements to police that implicated the Petitioner in the victim's death.

Counsel agreed that no evidence suggested the Petitioner actually beat the victim. He emphasized, however, that other evidence, such as the Petitioner's statement admitting involvement and the testimony of witnesses who saw the Petitioner in possession of the victim's truck and handgun, established that the Petitioner was present during, if not principally responsible for, the victim's robbery and death.

Counsel testified that, although the Petitioner's inculpatory statements were very harmful to his case, the State probably would have proceeded to trial on the strength of the remaining evidence had the trial court suppressed the Petitioner's statements. He agreed that he also based his decision to forego an interlocutory appeal on this probability.

Counsel confirmed that, at the time of the Petitioner's trial, he was aware that the State was not seeking the death penalty against Greg Smith due to Smith's low I.Q. and other psychological indicators that made him ineligible for the death penalty. Counsel, who was present during Smith's plea submission hearing, recalled that Smith became hostile during the hearing and that a recess was necessary for Smith's attorney to calm his client down. Counsel considered these factors in making the decision not to call Smith as a witness.

Counsel reiterated that he could not recall whether solicitation was charged as a lesser included offense of felony murder and especially aggravated robbery. He confirmed, however, that recent caselaw held that, where the solicited offense leads to a completed act, solicitation is not a lesser-included offense of that act. He could not recall whether this caselaw was released before or after the Petitioner's trial.

Counsel agreed that, before representing the Petitioner, he was involved in a case very similar to the Petitioner's case that received a great deal more publicity. He reiterated that, had he believed the pre-trial publicity to be excessive, he would have moved for sequestration of the jury.

Counsel testified he was certain that, if the Petitioner testified and denied giggling after being arrested, the Hickman County police officers who witnessed Smith and the Petitioner's jovial manner would have been able to testify. He agreed that the State could have called Smith himself to testify about how he and the Petitioner behaved shortly after their arrest.

Counsel testified not only that did he not feel the need to bring a *Batson* challenge as to any of the prospective jurors, but also that he did not even use all of his peremptory challenges on the jury pool because he found the pool so agreeable.

Counsel elaborated on his defense strategy of discrediting the State's witnesses, explaining that his main goal was to demonstrate that the State's proof did not establish the Petitioner entered the victim's home with the intent to rob her. Counsel emphasized that he was able to convince the trial court to exclude "a lot of evidence" that was very damaging to the Petitioner. Counsel testified that, despite the jury's verdict, the exclusions he obtained during the Petitioner's trial were "some of the best work" he had ever done.

Counsel said he did not meet with the Petitioner "a lot" but "plenty" to be prepared for the motion to suppress and for trial. During their meetings, the Petitioner did not appear to Counsel to understand the gravity of the charges against him, though Counsel attempted to explain the concept of felony murder to his client. The Petitioner rejected any plea offer from the State that involved a sentence greater than eight years, saying he preferred the death penalty to serving such a sentence. Counsel said the Petitioner did not believe "for a minute" that he would receive the fifty-one year sentence he ultimately received.

On re-direct examination, Counsel explained that the State was not interested in downgrading the Petitioner's charges in exchange for his testimony against Greg Smith because the State planned to make such a deal with Victoria Spicer, who was only fifteen or sixteen at the time.

Counsel confirmed the State presented no evidence that the Petitioner physically participated in beating the victim, as one could infer from the State's remark that "they beat her to death." He emphasized that he argued during closing statements that the Petitioner "never laid a hand on [the victim.]"

The Petitioner testified about the events leading up to his statements to police: he was in the company of Victoria Spicer and was working on his car in Greg Smith's yard when police arrived and asked for Smith. The Petitioner informed them Smith was not home, and the police asked where the Petitioner would be in an hour. He told them he would still be in Smith's yard, so police left and returned later "twenty cars deep." Police patted down everyone present and placed the Petitioner and Spicer in separate cars. Asked whether he felt he was under arrest at this time, the Petitioner said he "felt [he] needed to go [with them]." Police then transported the pair to separate interrogation rooms of the Hickman County Courthouse, and police soon informed him Spicer had disclosed what she knew of Smith and the Petitioner's involvement in the victim's death. Following this news, the Petitioner admitted his involvement to police.

The Petitioner reviewed a statement purporting to be that given by the Petitioner to police the day he was picked up with Spicer. The Petitioner testified that the statement was not in his handwriting, though he agreed that he initialed the statement. He testified that the statement inaccurately reported that Smith told the Petitioner who he was going to rob. The Petitioner insisted that Smith told the Petitioner that he was going to rob someone, but did not identify who he planned to rob.

The Petitioner reviewed the two addenda to his initial statement and again testified that the statements were not in his handwriting. He said these addenda likewise did not accurately reflect the statements he gave police. The Petitioner testified that police examined

13

him between six and seven hours at the Hickman County Courthouse.

On cross-examination, the Petitioner confirmed that he signed a waiver of his *Miranda* rights before he gave statements to police. He also confirmed that, at his suppression hearing, he testified about the events surrounding his statements to police.

At the conclusion of the hearing, the post-conviction court took the petition under advisement and later issued a written order denying relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends the post-conviction court erred when it rejected his claim that Counsel was ineffective and denied him post-conviction relief. Specifically, he contends Counsel was ineffective for failing to: (1) object to improper comments made during the State's closing remarks; (2) file an "adequate" motion to suppress statements made by the Petitioner to police; (3) request an interlocutory appeal of the denial of his motion to suppress the Petitioner's statements; (4) call Greg Smith as a witness at trial; (5) request the jury be instructed on the lesser included offenses of facilitation of first degree murder and solicitation of first degree murder; (6) request that the jury be sequestered; (7) challenge the removal of an African-American from the jury; (8) request a change of venue; (9) obtain a pre-trial order preventing the jury from seeing the Petitioner with wrist and ankle restraints and dressed in an orange prison jumpsuit; and (10) present evidence at trial. The State responds that Counsel was not ineffective and that the post-conviction court properly denied the Petitioner relief.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State,* 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State,* 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's

14

conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State,* 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of

15

counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Improper Closing Argument

The Defendant contends Counsel was ineffective for failing to object to the State's remarks during closing arguments that "they" violently robbed the victim, and "they" beat the victim to death. He argues that, because nothing suggested the Petitioner actually participated in the beating death of the victim, the comments were not only untrue but also "inflammatory." He contends Counsel was ineffective for failing to object and ask either for a mistrial or for the jury to be instructed to disregard the State's remarks. The State responds that the remarks were not improper because they reflected the legal theory of criminal responsibility for the acts of another upon which the Petitioner was being tried for his involvement in the victim's death.

The Tennessee Supreme Court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." *Terry*, 46 S.W.3d at 156 (citing *Sutton*, 562 S.W.2d at 823). This Court has explained that "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *See State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing

*Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995) *superseded by Rule on other grounds as stated in State v. West*, 19 S.W.3d 753, 755 (Tenn. 2000)).

In this case, the post-conviction court found that the State's assertion that "they" robbed and killed the victim was consistent with the State's theory of felony murder and that Counsel, therefore, was not ineffective for failing to object to the remarks. We agree with the post-conviction court that the State's remarks were not improper. The State neither argued nor presented evidence to prove that the Petitioner physically participated in beating the victim. It presented overwhelming evidence, however, to prove that the Petitioner was involved in her death in a way that made him guilty of felony murder, which, in essence, made the Petitioner criminally responsible for the actions of Greg Smith. The State, therefore, in stating that "they" robbed and killed the victim, likely was speaking in a legal rather than a literal sense. The remarks being "based upon the evidence introduced at trial" and "not otherwise improper under the facts or law," we conclude that the State's remarks were not improper. *See Goltz*, 111 S.W.3d at 5. Thus, Counsel was not ineffective for not objecting to the remarks. *See House*, 44 S.W.3d at 515. The Petitioner is not entitled to relief on this issue.

## B. Motion to Suppress

The Petitioner contends Counsel was ineffective for failing to argue at the suppression hearing concerning the Petitioner's statements that the Petitioner was unlawfully arrested before he gave the statements. The State responds that the Petitioner failed to establish by clear and convincing evidence his claim that he was unlawfully arrested. It further responds that, had Counsel succeeded in suppressing the statements, the State would have proceeded with its charges against the Petitioner based upon the State's remaining evidence.

The post-conviction court, in its written order, discredited the Petitioner's post-conviction testimony that he was arrested before he gave his statements and noted that the Petitioner failed to present the testimony of the officers present during his statement. The post-conviction court then found that Counsel's decision to base his suppression hearing argument upon the involuntariness of the Petitioner's *Miranda* waivers rather than the unlawfulness of the Petitioner's arrest was reasonable and did not render his assistance ineffective.

In order to prevail herein, the Petitioner must demonstrate, first, that Counsel unreasonably failed to pursue a line of argument that would have led to the suppression of the Petitioner's statements and, second, that without these statements the Petitioner would not have been convicted. T.C.A § 40-30-103; *Williams*, 599 S.W.2d at 279-80. The Petitioner has demonstrated neither.

17

As the Petitioner notes in his brief, a statement gathered as a result of an unlawful arrest may be subject to exclusion pursuant to the "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963). The post-conviction court, however, discredited the Petitioner's testimony that, at the time he gave incriminating statements to police, he believed he was under arrest. Such a credibility assessment being within its province, we will not second-guess the post-conviction court. *See Momon,* 18 S.W.3d at 156. The Petitioner presented no other evidence at the post-conviction hearing that the events leading up to his statement would have led a reasonable person to believe he or she was under arrest. Thus, the Petitioner failed to establish by clear and convincing evidence that Counsel successfully could have argued for the statements' suppression on this basis. Further, Counsel testified at the suppression hearing that, even had he succeeded in suppressing the statements, the State would have tried the Petitioner based upon the remaining circumstantial evidence against the Petitioner. Having failed to establish that Counsel's actions could have altered the result of the suppression hearing, the Petitioner has failed to demonstrate prejudice from Counsel's representation. *See Nichols*, 90 S.W.3d at 587. As such, we conclude Counsel was not ineffective in his advocacy on behalf of the Petitioner during the suppression hearing. *See Strickland*, 466 U.S. at 694. The Petitioner is not entitled to relief on this issue.

### C. Interlocutory Appeal

The Petitioner next argues that Counsel was ineffective for failing to file an interlocutory appeal of the trial court's denial of his motion to suppress the Petitioner's statements. As discussed above, the Petitioner has failed to demonstrate that, had his statements been suppressed, either the State would have abandoned its charges or the jury would have acquitted the Petitioner. Thus, the Petitioner has failed to establish by clear and convincing evidence that he was in any way prejudiced by Counsel foregoing an interlocutory appeal of his statements' admission. *See Nichols*, 90 S.W.3d at 587. Such a showing is essential to a finding that he is entitled to post-conviction relief. The Petitioner is not entitled to relief on these grounds.

### D. Testimony of Co-Defendant Greg Smith

The Petitioner argues Counsel was ineffective for failing to interview and call as a witness the Petitioner's co-defendant Greg Smith. The State responds that, given Counsel's conversations with Smith's attorney, his decision to not call Smith to testify was reasonable. It further cites the Petitioner's failure to present Smith's testimony at the post-conviction hearing as justification for the post-conviction court's denial of relief on this basis.

First, we note that in order for a petitioner to establish prejudice from his attorney's

failure to call a witness, the petitioner must have this witness testify at the post-conviction hearing. *Black*, 794 S.W.2d at 757. In *Black*, this Court established that:

> It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a witness or what that witness's testimony might have been if introduced by defense counsel. The same is true regarding the failure to call a known witness. In short, if a petitioner is able to establish that defense counsel was deficient in the investigation of the facts or calling a known witness, the petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called.

*Id.*

In this case, the post-conviction court found that Counsel decided to not call Smith as a witness in the Petitioner's trial because he believed Smith might "hurt his case more than he would help it." Indeed, Counsel testified at trial that Smith's attorney told him Smith had "mental situations" that made him a "wild card." This suspicion was confirmed by Smith's outburst during his own guilty plea hearing. Fearing that Smith might testify that the Petitioner agreed to rob and murder the victim before he accompanied Smith into the victim's house, Counsel decided to not call Smith as a witness in order to avoid bolstering the State's argument that the Petitioner was complicit in the robbery and murder. Thus, the record does not preponderate against the post-conviction court's finding that Counsel based his decision not to call Smith on his belief Smith would hurt the Petitioner's case. *See Black*, 794 S.W.2d at 755. We conclude Counsel's decision to not put Smith on the stand in the Petitioner's defense was a sound one, based upon reasonable trial strategy. *See Hellard*, 629 S.W.2d at 9. Further, assuming *arguendo* that Counsel was unreasonable for not to calling Smith as a witness, the Petitioner's did not present Smith's testimony at his post-conviction hearing and, therefore, has not demonstrated with clear and convincing evidence that Smith's testimony would have affected the outcome of his trial. *See Black*, 794 S.W.2d at 755. We conclude that, because the Petitioner Counsel's decision to not call Smith was based upon reasonable trial strategy, the post-conviction court properly denied post-conviction relief. The Petitioner is not entitled to relief on this issue. *See Strickland,* 466 U.S. at 694.

### E. Instruction on Lesser-Included Offenses

The Petitioner argues Counsel was ineffective for failing to ensure the trial court instructed the jury on two lesser included offenses of first degree murder: solicitation of first degree murder and facilitation of first-degree murder. The State, whose brief reproduces a

portion of the trial transcript not included in the appellate record, responds that the trial court did indeed instruct the jury on facilitation of first degree murder but properly refused to instruct the jury on solicitation of first degree murder, which is not a lesser included offense of first degree murder where the solicited offense results in the death of the victim.

A conviction for solicitation may lie where a person "by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense . . . with the intent that the criminal offense be committed. . . ." T.C.A. § 39-12-102(a) (2003). Solicitation is only a lesser included offense of the solicited offense where "no proof exists of the completion of the [solicited] crime." *State v. Robinson*, 146 S.W.3d 469, 486-87 (Tenn. 2004); *State v. Ely*, 48 S.W.3d 710, 719 (Tenn. 2001).

The State attached to its brief the transcript of the jury instructions given in this case, which reveal that the trial court declined to instruct the jury on solicitation of murder. Referencing a copy in its possession of the preliminary instructions issued to the jury, the post-conviction court concluded that facilitation was charged to the jury. Not having in its possession the transcript of the instructions given to the jury in this case, however, it assumed the solicitation instruction was not issued. Based upon *State v. Robinson*, however, it concluded that the Petitioner was not entitled to a solicitation instruction given that evidence established the completion of the charged offense, i.e. the victim's death.

As the post-conviction court noted in its written order, the Petitioner's objection is more properly directed toward not receiving an instruction on solicitation of felony murder rather than first degree murder, given his ultimate felony murder conviction. We will accordingly address his claim on this basis.

We agree with the post-conviction court that the Petitioner was not entitled to a solicitation instruction. Because the evidence in this case clearly established the completed offense of murder, the evidence would have precluded a conviction for solicitation, which requires that the solicited offense not be completed. *See Robinson*, 146 S.W.3d at 486-87. Accordingly, the trial court properly declined to issue the solicitation instruction, and Counsel was in no way ineffective with respect to this issue. *See Strickland,* 466 U.S. at 690. The Petitioner is not entitled to relief on this issue.

### F. Jury Sequestration

The Petitioner next contends Counsel was ineffective for failing to request that the jury be sequestered. Sequestration is available "[i]n all criminal prosecutions . . . at the sound discretion of the trial judge, which shall prohibit the jurors from separating at times

when they are not engaged upon actual trial or deliberation of the case." T.C.A. § 40-18-116 (2003).

In this case, the post-conviction court found that no significant pre-trial publicity took place and that the Petitioner failed to present evidence that the jury received outside information. The court found Counsel's decision not to request sequestration was reasonable.

At the post-conviction hearing, Counsel explained that he did not seek sequestration not only because no pre-trial publicity had taken place that would justify sequestration but also because he wished to avoid inflating the seriousness of the charges against the Petitioner in the jurors' minds. He explained that, were he to request sequestration, the jury might believe the Petitioner was the principal offender in the murder whereas Counsel believed the evidence would show the Petitioner was merely present during the offense. At the post-conviction hearing, the Petitioner presented no evidence of excessive pre-trial publicity in his case. Thus, the evidence does not preponderate against the post-conviction court's finding that the Petitioner's trial was not besieged with inordinate publicity. *See Black*, 794 S.W.2d at 755. Further, we conclude that Counsel's decision not to seek jury sequestration was an informed decision, based on his strategy of minimizing the Petitioner's role in the victim's death. *See House*, 44 S.W.3d at 515. Thus, the Petitioner is not entitled to relief on this issue.

### G. Removal of African-American from Jury

The Petitioner next contends Counsel was ineffective for failing to "challenge the removal of potential African American jurors from the jury pool . . . effectively denying the [Petitioner] a right to a jury made up of a cross section of the community." The State responds that, because the Petitioner presented no evidence that an African-American was removed from the jury, he failed to prove by clear and convincing evidence that Counsel was ineffective for failing to object to the jury's make-up.

The United States Constitution and Article I, section 9 of the Tennessee Constitution guarantee a defendant the right to a jury drawn from a venire that represents a fair cross-section of the community. *State v. Bell*, 745 S.W.2d 858, 860 (Tenn. 1988). The United States Supreme Court in *State v. Duren* set forth the elements of a prima facie violation of this fair cross-section requirement:

(1) that the group alleged to be excluded is a "distinctive" group in the community;

(2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3) that this under[-]representation is due to the systematic exclusion of the group in the jury-selection process.

439 U.S. 357 (1979).

The post-conviction court rejected this basis for post-conviction relief after finding that the Petitioner failed to present evidence that the State removed an African-American from his jury.

Whether the Petitioner contends that Counsel should have objected to the removal of a specific African-American juror or to the fact that his jury venire did not reflect a fair cross-section of the community is unclear from the Petitioner's brief. In any case, the Petitioner failed to present evidence to support either claim. Even had he presented evidence that the State struck an African-American from the jury, such evidence would be irrelevant to a fair cross-section claim, as such a claim concerns the composition only of the jury venire, not of the petit jury. *Id*. Further, the Petitioner failed to present evidence that the representation of African-Americans in the venire from which his jury was selected was not "fair and reasonable in relation to the number of such persons in the community." Thus, he failed to support his claim that a fair cross-section violation, to which Counsel should have objected, occurred. *Id*. The record containing no proof of a constitutional flaw in the jury venire, we conclude the post-conviction court properly rejected the Petitioner's claim that Counsel was ineffective for not objecting to the jury's make-up. *See Strickland,* 466 U.S. at 690. He is not entitled to relief on this issue.

## H. Change of Venue

The Petitioner contends Counsel was ineffective for failing to request a change of venue in his case. The State responds that, because the Petitioner failed to support this claim with proof that the jurors who convicted him were "biased or prejudiced by outside information," he failed to establish that Counsel was ineffective in this regard.

The post-conviction court rejected the Petitioner's claim that Counsel was ineffective for failing to ask for a change of venue, finding that the Petitioner failed to support his claim with evidence of pre-trial publicity or undue excitement in the community in which his trial was held. Indeed, Counsel testified at trial that he was aware of only a few local articles reporting the charges against the Petitioner and his co-defendants. He testified that the media

22

coverage of the Petitioner's trial was slight in comparison with similar murder trials in which he had participated. Thus, the record does not preponderate against the post-conviction court's finding that the Petitioner failed to show that a change of venue would have been successful. *Black*, 794 S.W.2d at 757. Thus, the Petitioner failed to show how Counsel's decision to not pursue a change of venue prejudiced him. Further, Counsel explained at the post-conviction hearing that any of the alternative counties to which the Petitioner's case could have been transferred were actually less desirable because they were prosecution-friendly. Counsel's decision, therefore, was based upon sound trial strategy. As such, we conclude Counsel was not ineffective for choosing not to seek a change of venue. *See Williams*, 599 S.W.2d at 279-80. The Petitioner is not entitled to relief on this issue.

### I. Petitioner's Appearance in Jumpsuit and Restraints

The Petitioner argues Counsel was ineffective for failing to seek a pre-trial order preventing the Petitioner from being to brought to court in jail attire. He contends that he was prejudiced because jurors could have seen him when he arrived in jail attire the first day of his trial. The State responds that, because the Petitioner failed to present evidence that a member of the jury saw him dressed in jail attire, he failed to prove he suffered prejudice from being dressed in jail attire.

The United States Supreme Court has held that forcing a defendant to stand trial in jail attire violates the defendant's right to due process because "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." *Estelle v. Williams*, 425 U.S. 501, 504-05 (1976). The post-conviction court rejected this basis for post-conviction relief based upon the Petitioner's failure to present evidence that jurors saw him dressed in jail attire.

The evidence at the post-conviction hearing showed that the Petitioner did not stand trial in jail attire. Rather, he arrived at his first day of trial wearing a jumpsuit and restraints, and, after Counsel was alerted, Counsel immediately purchased street clothes for the Petitioner. The Petitioner then quickly changed into the street clothes. No evidence was presented at the post-conviction hearing that a member of the jury viewed the Petitioner before he changed into his street clothes. Thus, the facts of this case do not the indicate that the Petitioner suffered the prejudice *Estelle v. Williams* seeks to remedy. As such, no actual harm befell the Petitioner, and Counsel, therefore, was not ineffective for not seeking a pre-trial order preventing the Petitioner from being clothed in jail attire on his first day of trial. *See Denton,* 945 S.W.2d at 796. The Petitioner is not entitled to relief on this issue.

### J. Lack of Defense Proof

The Petitioner argues Counsel was ineffective for failing to present evidence in defense of the Petitioner, instead relying upon cross-examination and impeachment of the State's witnesses. The State argues that Counsel, having no witnesses whose testimony could aid the Petitioner's defense, was left only to distance his client from co-defendant Smith and limit the impact of the Petitioner's inculpatory statements.

The post-conviction court found that Counsel called no witnesses because he was concerned that each of the witnesses with relevant information might make the Petitioner's knowledge that Smith intended to rob the victim "more plainly apparent" to the jury. Indeed, the evidence does not preponderate against this finding. *See Black*, 794 S.W.2d at 755. We set out above why Counsel was loath to call Co-Defendant Smith as a witness. In essence, Smith was unreliable, and his guilty plea itself imputed guilt to the Petitioner, who was his companion in the victim's beating death. For co-defendant Spicer's part, her attorney indicated Spicer was unwilling to "say anything." Also, because co-defendant Spicer had yet to reach a plea agreement with the State, she had incentive to testify disfavorably toward the Petitioner. Counsel went to the scene of the crime, interviewed the State's witnesses, and interviewed people who lived near the Petitioner, but he located no one who could provide favorable testimony for the Petitioner. We conclude that, "within the context of the case as a whole, taking into account all relevant circumstances," Counsel was not ineffective for defending the Petitioner by weakening the State's case rather than presenting new witnesses. *See Strickland*, 466 U.S. at 690; *Mitchell*, 753 S.W.2d at 149. The Petitioner is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and applicable law, we conclude the Petitioner has failed to demonstrate that the post-conviction court erred when it denied his petition for post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

24