STATE of Tennessee, Appellee,

v.

Roger M. BELL, Appellant,

Supreme Court of Tennessee,
at Knoxville.

Jan. 25, 1988.

W.J. Michael Cody, Atty. Gen. & Reporter, Kathy M. Principe, Asst. Atty. Gen., Nashville, Thomas J. Evans, Asst. Dist. Atty. Gen., Chattanooga, for appellee.

Charles P. Dupree, Chattanooga, for appellant.

## OPINION

O'BRIEN, Justice.

In the trial court defendant and Gregory Billups were jointly indicted for both common law and felony murder involving the homicide of Willie McKibbens. They were also charged with the offense of burglary and two counts of felonious assault. In a jury trial Bell was convicted of each of the foregoing offenses. He was sentenced to death by electrocution on the homicide charge, to life imprisonment on each of the felonious assault counts and fifteen (15) years for burglary. The trial court ordered all sentences to be served consecutively. Gregory Billups, was found guilty of bur-

glary only. Bell challenges all of his convictions on various grounds.

We first consider the charge that the trial court erred in failing to suppress statements made by him to the police. He argues these statements were obtained in violation of his rights under the authority of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He says he was in custody in a police station, not free to go, at the time the statements were made by him. There was a suppression hearing in which the only evidence offered was the testimony of an investigating officer who testified that defendant was brought to the Police Service Center for questioning. Defendant was advised of his right not to make a statement and declined to sign a written waiver form. The officer testified that defendant agreed to talk with him on being assured that nothing would be taped. Defendant declined to testify at the suppression hearing. The trial court denied the motion to suppress because the uncontroverted proof indicated he voluntarily spoke to the detective. The officer then testified before the jury that he had questioned Bell about the incident and his relationship with Gregory Billups. Bell claimed he had not seen Billups for two or three months. When told that the police had information he had been seen with Billups the night of the homicide, he denied it. The officer told him that if more information or evidence was found indicating he was involved he could be facing charges. The defendant responded by saying, "go for it". He was not arrested until nearly two weeks later.

Defendant further argues that even if the trial court was not in error in allowing admission of that part of the statement referring to his relationship with Billups, it was clear error to admit the phrase "go for it".

■ The evidence indicates that defendant was in custody within the meaning of *Miranda,* supra, when the statement was made and that the latter response to the officer's comment to him was part and parcel of his entire statement. He was properly advised of his rights and the trial court found his statement was voluntary. Once the facts surrounding the giving of statements are resolved by the trial court's determination, that finding is binding upon the appellate courts if there is any evidence to support it. See *State v. O'Guinn,* 709 S.W.2d 561, 566 (Tenn.1986). The evidence clearly does not preponderate against the trial court's findings in this case that defendant's statement in its entirety was admissible.

Defendant claims error on the part of the trial court in not striking the jury venire because application of the exemption statute, TCA § 22-1-102, et seq., deprived him of an impartial jury drawn from a cross-section of the community. Defendant's constitutional argument is legally sound. Selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial. *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975). However, it is factually flawed. The argument is made that the qualification and exemption statutes automatically exempt certain classes and occupations of people from jury service based on their unverified representations or informal requests to the secretary of the judge selecting the jury.

■ The statute in effect at the time of defendant's trial disqualified persons convicted of certain infamous offenses designated by statute, persons of unsound mind, persons not in the full possession of their senses of hearing and seeing, and habitual drunkards as incompetent to act as jurors. TCA § 22-1-102. Certain occupational and disability exemptions are allowed by TCA § 22-1-103. Any person in the community may be excused from serving as a juror for health or hardship reasons under TCA § 22-1-104. Defendant has failed to establish his contention that the jury selection system in Hamilton County systematically excluded distinctive groups so that it was not reasonably representative of a fair cross-section of its population. In *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979) the United States Supreme Court set out the criteria to estab-

lish a prima facie violation of the fair-cross-section requirement:

"[T]he defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this representation is due to systematic exclusion of the group in the jury selection process."

The only proof offered in this case was that some of the jury summonses issued for the venire from which the jury panel for defendant's trial was selected had been returned stating exemptions or requesting to be excused from jury service and these were not subsequently verified to determine if the requests were legitimate. The evidence was that ninety-six (96) prospective jurors were selected to make up the first venire. All of the summonses returned passed through the hands of the judge assigned to impanelling juries. We have examined the returned summons which were included in the record as a composite exhibit. The small number returned with what appeared to be invalid or unwarranted reasons to be excused or exempted is a splendid commentary on the conscientious attitude of the population at large in responding to a call for jury service.

■ TCA § 22-2-308 provides for impanelling juries and for the drawing of additional jurors in the event the first venire is insufficient by reason of the disqualification of proposed jurors until a sufficient number of names of persons have been summoned to complete the juries. In *Taylor v. Louisiana*, supra, 95 S.Ct. at p. 700, the court made it clear that the states are free to grant exemptions from jury service to individuals in cases of special hardship or incapacity and to those engaged in particular occupations the uninterrupted performance of which is critical to the community's welfare. There is no possibility that the exemptions granted under Tennessee's jury selection system posed any substantial threat that the remaining pool of jurors would not be representative of the community. This issue is without merit.

■ Secondarily, defendant insists that because TCA § 22-1-102 excludes convicted felons from jury service and that nationwide studies have been made showing that black males are ten times more likely to have been in trouble with the law than their white counterparts, this provision and its application acts to eliminate a great number of black males in every community from participating in jury service.

There is absolutely no evidence in this record that there has been any exclusion of any cognizable or identifiable group, racial or otherwise, by virtue of the jury selection system employed in this case. TCA § 22-2-302 requires that the Board of Jury Commissioners shall select the names of persons to serve as jurors from a list of names of upright and intelligent persons known for their integrity, fair character and sound judgment who are otherwise legally qualified to serve as jurors. The State has elected to exclude convicted felons from that category. The United States Supreme Court has made it plain that the fair-cross-section principle must have much leeway in its application. In *Taylor v. Louisiana*, supra, it was said:

"The states remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemption so long as it may be fairly said that the jury list or panels are representative of the community." (Citations omitted).

This issue too is without merit.

It is defendant's contention that the verdict was contrary to the weight of the evidence. Our review of the record confirms that the evidence was overwhelmingly sufficient to warrant the jury verdict of guilty.

This case involves the burglary of the residence of Marsha (Mont) Finley who resided in the Wheeler Home Housing Project in Chattanooga. Shortly before 4:30 a.m. on 12 August 1985 Finley awoke to find a man in her darkened bedroom. When she called out the man shot her and then fired two times into the bed where a man named Willie McKibbens was sleeping.

The assailant then shot Finley again and attempted to rape her, threatening to kill everyone there if she did not submit. Finley screamed to her fourteen-year-old daughter and her niece Natalia Reed, who were sleeping in another bedroom, to call the police. When Natalia answered the intruder went into her bedroom and shot her in the elbow as she was endeavoring to use the telephone. The man then tried to re-enter Finley's room. Her efforts to shut the door were partially blocked by an overturned oxygen bottle. The man stuck his arm through the opening, fired one last time and departed. McKibbens died as a result of two gunshot wounds, one to his left forehead, the other to his left chest.

Natalia Reed was unable to identify the intruder. Finley did not identify her assailant until the day of a preliminary hearing. She admitted to police that at the time of the assault she had recognized the man as the defendant Roger Bell, one of her neighbors. She explained she had been threatened and was scared of both defendants.

Anthony Bell, no kin to defendant, lived next door to him. He testified that about 4:10 a.m. on 12 August 1985 he had gone out on his porch to cool off. He looked across a field between his duplex and Finley's and observed Gregory Billups peering into Finley's bedroom window. Billups pulled the screen loose on a side window and finally entered the dwelling through the back door. He saw another man, whom he could not identify at the time, standing near the back door. He re-entered his house and shortly heard gunshots and someone calling, "my mama's dead." He went back outside and saw Finley, her niece and daughter screaming on their front porch. He also saw Roger Bell and Billups drive away in defendant's van.

Another witness Alphonso Dale Pitts testified he was driving through the Wheeler Homes Project between 4:00 and 4:30 a.m., the date of the homicide, when he saw a man carrying a gun run in front of his car from the direction of Finley's residence. He later identified this man as defendant Bell.

Billups testified at trial that he and Bell had been visiting friends and drinking intoxicants earlier on the night the offenses occurred. At Bell's suggestion they proceeded to Finley's residence to get some marijuana and then decided to "get the reefer and the money." Bell told Billups all he needed to do was open one of the windows. He first tried to enter a side window and then opened the back door by pulling out the plexiglass, reaching in, and unlocking it. He followed Bell in the back door. When he saw Bell had a gun he backed away. As he started to leave he saw the lights go out, heard a woman call and shots being fired. He ran across the field to Bell's van. Bell appeared shortly and said he had shot Finley. He admonished Billups, in the event he was apprehended, to say he had seen nothing and knew nothing.

There was other evidence. Billups' fingerprints were found on the window from which the screen had been removed. Defendant's van, bearing a license plate registered to an automobile once owned by Billups' girlfriend, was found in Lafayette, Georgia. Bell was questioned by police several days after the homicide. He admitted knowing Billups but denied having seen him recently. There was testimony that the two of them had been seen together on the night of August 11th and 12th. Defendant came to Billups' residence and talked with witnesses there about the homicide. An inmate at the Hamilton County Jail testified he overheard Bell accuse Billups of "snitching on him" and also say "they couldn't prove anything on him because they couldn't find the gun."

■ The evidence to support the conviction of defendant for murder in the first degree was legally sufficient beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); T.R.A.P. 13(e).

■ In another issue it is contended that the jury instructions with respect to malice in the guilt stage of the proceedings improperly shifted the burden of proof to the defense, contrary to *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61

L.Ed.2d 39 (1979). We have examined the charge in which the trial judge instructed the jury that if the State had proved beyond a reasonable doubt that a killing had occurred the jury might infer that the killing was done maliciously, but this inference could be rebutted by either direct or circumstantial evidence, or both, regardless of whether the same was offered by the defendant, or existed in the evidence of the State. The same instruction was delivered in reference to the use of a deadly weapon. In *State v. Bolin,* 678 S.W.2d 40, (Tenn. 1984), this Court made clear that the instruction as delivered was not susceptible to any understanding or construction that the burden of proof on the issue of malice was shifted to the accused. The issue is without merit.

■ Defendant complains the trial court erred in accepting the verdict of the jury finding him guilty of both first degree murder and felony murder for the same offense. The record does not sustain defendant's complaint. The jury returned a verdict on each of two counts of the indictment charging common law murder and felony murder. However, the judgment of the trial court found defendant guilty of premeditated murder in the first degree by use of a firearm in Case No. 162948. The verdict returned by the jury was actually a general verdict finding the defendant guilty as charged of both counts of the indictment. That part of the verdict finding the defendant guilty of felony murder was no more than surplusage and was properly rejected by the trial court.

■ The defendant says the court erred in fixing life sentences on the assault to murder charges and the maximum sentence for burglary. He argues that under the criteria set by this Court in *State v. Moss,* 727 S.W.2d 229 (Tenn.1986) that the sentences are excessive. We have conducted a de novo review on the record concerning the length of the sentences as we are required to do. TCA § 40–35–402(d). We do not think the sentences on the assault to murder charge were excessive. This was one of the most senseless, heinous acts of violence to be imagined. Defendant appar-

ently attempted, as he threatened, to kill everyone present in the house. He was sentenced to be executed for the death of Willie McKibbens. It is only by an act of grace that one or more of the others present were not killed by his conduct. Defendant was properly sentenced as a Range II persistent offender. However, we find no reason under the Criminal Sentencing Reform Act to fix the burglary sentence in this case to run consecutive to the two consecutive life sentences on the assault judgments, and none appear in this record. We modify the sentences in this case to fix the burglary sentence of fifteen (15) years to run concurrently with the sentences on the assault to murder charges.

■ Defendant asserts that the trial judge committed error during the penalty phase by the manner in which he instructed the jury on aggravating and mitigating circumstances. In reference to aggravating circumstances the defendant objected specifically to the instruction to the jury that they might consider as one of the specified statutory aggravating circumstances that "the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." He insists the evidence in the record does not support it and was contrary to the State's theory of the case. Under the record, as we have reviewed it, we would be hard put to say the record sustained the foregoing instruction. However, we consider the issue moot since the jury did not find that as one of the aggravating circumstances in fixing the death penalty. See *State v. Smith,* 695 S.W.2d 954, 959 (Tenn.1985).

■ Defendant also insists he was entitled to an instruction on mitigating circumstances to the effect that he had no significant history of prior criminal activity. Based on defendant's prior criminal record of convictions for joy riding, grand larceny, and prison escape, the trial judge found such an instruction would not apply. We think the finding was appropriate and defendant was not entitled to that instruction as a mitigating circumstance.

■ The trial judge also instructed the jury that they should weigh and consider any mitigating circumstances which they found in the evidence and that mitigating circumstances were circumstances which lessen the harshness or severity of the crime. He had previously informed counsel that none of the mitigating circumstances included in TCA § 39–2–203(j) were appropriate to be stated to the jury. Defendant insists the instruction as given was not correct and that a mitigating circumstance is a factor for the jury to consider in lessening the severity of punishment and they should also have been informed that they could look to proof outside of the crime itself in making their deliberations. The statute specifically provides in subsection (c) that in the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background, history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) ...; and any evidence tending to establish or rebut any mitigating factors. Subsection (e) mandates that the trial judge shall include in his instructions for the jury to weigh and consider any mitigating circumstances .. which may be raised by the evidence at either the guilt or sentencing hearing, or both. Subsection (j) requires that the jury shall consider ... any mitigating circumstances which shall include, but not be limited to those enumerated. Defendant was allowed to introduce such proof as he saw fit in mitigation. The trial court found that none of the statutory circumstances were appropriate. While a better definition might have been given by him, in light of the entire charge we do not find the instruction as delivered to be a denial of due process.

Defendant says the Tennessee Death Penalty Statute is unconstitutional for the reason that it mandates death if no mitigating circumstances is found; gives the jury no guidance on how aggravating and miti-

gating circumstances should be weighed; and, by construction, places the burden of proof on a defendant to avoid death where a conviction for felony murder has been returned.

■ This Court has repeatedly held that Tennessee's Death Penalty Statute does not require a mandatory death penalty. See *State v. Teague*, 680 S.W.2d 785, 790 (Tenn.1984), cert. denied 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 662 (1985). The jury instruction delivered by the trial court repeats in at least four instances that the requirement is upon the State to prove beyond a reasonable doubt all of the circumstances which may be considered in determining the sentence to be imposed upon a defendant. Reasonable doubt is defined for the jury's benefit and there is no possibility for the jury to be confused or conclude that the burden of proof has been shifted to the defendant in any sense whatsoever.

An issue is raised charging error to the trial court in failing to strike the venire or grant a mistrial when the State used its peremptory challenges to remove black persons from the petit jury. Defendant relies on the decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The *Batson* decision was released on 30 April 1986. The trial in this case began on 20 May 1986. In *Batson* the United States Supreme Court reexamined that portion of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), concerning the evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race from the petit jury.

In *Swain* the Court reviewed the constitutional principles involved in purposeful discrimination against people of the Negro race by their exclusion from jury service. In so doing they cited from numerous cases beginning with *Strauder v. West Virginia*, 10 Otto 303, 100 U.S. 303, 25 L.Ed. 664 (1880), distilling the principle set forth in

*Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84:

> "For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and laws enacted under it but is at war with our basic concept of a democratic society in a representative government."

*Swain* also examined in depth the origin and history of peremptory challenges in the trial of criminal cases, available to a criminal defendant as early as the year 1300 in England and ultimately incorporated into the common law of this country. The thrust of *Swain* was to uphold the exercise of peremptory challenges in criminal cases, leaving the burden with the defendant in a specific case to prove that by use of such a procedure he was denied equal protection of the law. To do so he was required to show that the purposes of the peremptory challenges by the State were being perverted to deny members of his race the same right and opportunity to participate in the administration of justice as was enjoyed by the white population.

The facts of this case are strikingly similar to those which existed in *Batson,* supra. *Batson,* a black man, was indicted for second degree burglary and receipt of stolen goods.[1] In each case, during the conduct of the voir dire examination of the venire, certain jurors were excused for cause.[2] During the exercise of peremptory challenges in both cases the prosecutor used his challenges to remove jurors who were non-Caucasians resulting in an all white jury. Two of these challenges in this case were people of Negro origin. The third was a dark-complexioned person who was an hispanic migrant from the Dominican Republic.

After the jury had been selected defense counsel challenged the selection process by the prosecution as a violation of the rule

stated in *Batson,* supra, taking the position that the defense had made out a prima facie case of purposeful discrimination, thus shifting the burden to the State to explain adequately the racial exclusion. The trial judge in this case held that the distinguishing factor in *Batson* was the difference in race between the defendant and the victim. He noted generally that in the past, for many years, attorneys general at times did exclude black persons from juries in cases where the defendant was black and the victim white, which was the case in *Batson.* He declined to attribute that motive to the Attorney General in this case, that is, exercising challenges so that he would have a jury of one race judging a defendant of another race. He further noted that in the final round the Attorney General exercised five challenges, two of which were to black people and a third to the proposed juror of Spanish descent. He specifically advised defense counsel that if the victims were white he would be required to allow them to proceed with their motion and also require the Attorney General to show why he had excused the black jurors. He specifically ruled that *Batson* did not apply because that decision was aimed at the evil of having the State excuse black jurors so that black defendants would be judged by white jurors for crimes committed on white victims, which was patently discriminatory. Defendant has raised this ruling as a secondary issue.

■■■ The exercise of peremptory challenges by the State for purely racial reasons violates the Equal Protection Clause. *Swain v. Alabama,* supra. In *Batson,* the court overturned the evidentiary requirements of *Swain* noted heretofore, and held:

> "... [A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the

---

**1.** Although the record does not specifically state so there is some inference that the victim was white.

**2.** Some of the jurors excused for cause in this case were black. The record does not indicate the number.

defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate'.... Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the impanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors.... [W]e emphasize that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause.... [b]ut the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption or his intuitive judgment—that they would be partial to the defendant because of their shared race.... [T]he Equal Protection Clause ... forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black.... [N]or may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirming his good faith in individual selections ...' [T]he prosecutor therefore must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination. Batson, 106 S.Ct. at 1722–24. (Citations and footnotes omitted); Also see Grady v. State, 730 S.W.2d 191 (Tex.App.–Dallas 1987)."

This case came to trial less than a month after the decision in Batson. Nevertheless, the trial judge, as well as the lawyers, endeavored to comport themselves with its requirements, albeit unsuccessfully. Defense counsel raised the issue and attempted to make the prima facie showing of purposeful racial discrimination described in Batson. The trial judge indicated he was aware of the requirements of the Batson decision and was watching the selection of jurors insofar as race was concerned. He knew there were other black jurors on the venire yet to be called when the jury panel was filled. He did not mark down the race of the various jurors who were called because he was satisfied that the Attorney General did not intentionally strike only black jurors.[3] The State responded for the record to defense counsel's challenge to the selection process, even though the trial judge did not allow the defense to proceed with the effort to estab-

---

**3.** The issue is not if he struck only black jurors, but if he struck all black jurors from the jury panel finally selected.

lish its case. The Assistant District Attorney General argued that it was unfair to require the State to justify the reasons for its exercise of peremptory challenges at the end of jury selection involving a two-day voir dire. He stated he had excluded no one because they were black. He recalled that one of the prospective jurors had been acquainted with a defense witness and knew a number of things about the case. Another challenged member of the venire was unmarried and had a child and it was his experience that a person with that background would not be a very favorable juror. He could not recall why he had challenged the person who appeared to be of hispanic or some other background or persuasion.

We are of the opinion the entire proceeding was insufficient to meet the mandate of *Batson*. This case is peculiar in the fact that not only the defendants and the victims, but all of the principal witnesses as well, were members of the black race. Nonetheless the trial judge was incorrect in denying the defense the opportunity to establish a possible discriminatory practice in jury selection because of that fact. While that is a factor which may be considered to "discount any advantage that a discriminating prosecutor might perceive in striking blacks from the jury", *United States v. Mathews*, 803 F.2d 325, 332 (7th Cir.1986), the United States Supreme Court has emphasized in *Batson* at p. 1718 that there are other considerations to be taken into account in discriminatory jury selection practices:

> "As long ago as *Strauder*, the Court recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror....
>
> The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice. (Citations omitted)."

▮▮ The trial judge did not make any finding on the threshold issue of whether the defendant was able to establish a prima facie case of purposeful discrimination in selection of the petit jury. This is a function relegated to him under *Batson*. Consequently we remand this cause for a further hearing to determine, under the standards of *Batson*, based upon all relevant circumstances and evidence at the original trial, whether there has been purposeful racial discrimination in the State's exercise of its peremptory challenges. The defendant is entitled to be given the opportunity to demonstrate a prima facie case. If the trial court determines that he has failed in this endeavor that will conclude the matter except for a written finding by the trial judge. If the trial court finds that a prima facie case of discriminatory practice has been established the State will be given an opportunity to explain its reasons for the racial exclusion. The judge will then determine if the defendant has established purposeful discrimination. In either event the trial court will make written findings to be filed with the transcript of the hearing and then transmitted to this Court.

▮▮ We reiterate for the benefit of the bench and bar that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as well as the Declaration of Rights established by Article 1, Sec. 9 of the Tennessee Constitution will not tolerate the exclusion of any individual racial group from jury service on that account, or on the false assumption that members of his race as a group are not qualified to serve as jurors. Purposeful racial discrimination in selection of a jury violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure. "The very idea of a jury is a body ... composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having

**868**

the same legal status in society as that which he holds. The petit jury has occupied a central position in our system of justice by safeguarding a person accused of crime against the arbitrary exercise of power by prosecutor or judge. Those on the venire must be 'indifferently chosen' ... to secure the defendant's right ... to 'protection of life and liberty against race or color prejudice.' " *Batson v. Kentucky*, 106 S.Ct. at p. 1717. (Citations omitted).

We have examined all of the issues raised on this appeal and find all to be without merit except the issue pertaining to the peremptory challenges during voir dire.

The case is remanded to the trial court for a further hearing in accordance with the directions set forth heretofore in this opinion. Upon the conclusion of that hearing the record will be returned to this Court for such further ruling as may be required in the case.

HARBISON, C.J., and FONES, COOPER and DROWOTA, JJ., concur.