# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs August 22, 2012 at Knoxville

## STATE OF TENNESSEE v. MARC A. CROWDER

**Appeal from the Circuit Court for Montgomery County**
**No. 41000401     John H. Gasaway, Judge**

---

**No. M2011-02436-CCA-R3-CD - Filed September 27, 2012**

---

The defendant, Marc A. Crowder, was convicted by a Montgomery County jury of aggravated assault and aggravated robbery and was sentenced by the trial court to an effective term of nine years in the Department of Correction. He raises two issues on appeal: (1) whether he was denied his constitutional right to a jury of his peers by the lack of a fair cross-representation of the community among the venire members; and (2) whether the evidence is sufficient to sustain his convictions. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JEFFREY S. BIVINS, J., joined.

B. Nathan Hunt (on appeal) and James R. Potter (at trial), Clarksville, Tennessee, for the appellant, Marc A. Crowder.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and John E. Finklea, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

This case arises out of a January 15, 2010 armed robbery that took place in the parking lot of a Clarksville apartment complex. The State's proof showed that the robbery victim, Chadley Jewett, was set up by the defendant's accomplice, Jacob Knight, who lured Jewett to the apartment complex under the pretense of wanting to purchase some Xanax pills. When

Jewett arrived, the defendant, who was armed with a handgun, threatened Jewett's companion, Kenneth Gee, struck Jewett in the face and throat, and fled the scene with Jewett's cell phone and purse.

On April 5, 2010, the Montgomery County Grand Jury returned a two-count indictment charging the defendant and Knight with the aggravated robbery of Jewett and the aggravated assault of Gee. Knight subsequently pled guilty to facilitating the crimes, and he later testified on the State's behalf at the defendant's January 18-19, 2011 trial.

At trial, Jewett testified that Knight called her at approximately 3:00 a.m. on the day of the robbery to negotiate to buy some Xanax pills from her for $45. She said they planned to meet at a Kroger, but Knight called while she was en route to the store and offered to pay her additional money if she would meet him at the Riverside Apartments instead. She agreed, drove to the apartment complex, and parked her vehicle in the last parking space beside the dumpster at the back. She was accompanied by Gee, who was in her front passenger seat, and two other male friends, who were in the backseat of her vehicle.

After she pulled into the parking spot, Jewett called Knight to let him know that she had arrived. He came outside to her driver's side window and told her that he did not have enough money to meet their agreed price. They discussed it for a moment until Knight stepped back and "all of a sudden" an African-American man that Jewett had never seen before came up to the car, placed a gun behind her ear, and ordered her to empty her pockets. Jewett said that she could barely see the man, whose face was in the shadows.

Jewett testified that her purse was on the passenger side floorboard, but she told the man that she did not have anything except a nickel because she did not want to give up her belongings. She said the gunman said something else and then removed the gun from her neck as he turned his attention to Gee, who had started to unbuckle his seatbelt. The gunman then placed his gun back on her neck, said, "[I]f y'all don't give me this," and made a noise that sounded as if he was cocking the gun. At that point, her cell phone rang and the gunman grabbed it from her lap. She responded by unbuckling her seatbelt, exiting her car, and grabbing the gunman's weapon with her left hand as she swung and hit him with her right hand. He swung back, punching her in the mouth, and she swung and hit him a second time before he hit her again, striking her in the neck and knocking her to the ground.

Jewett explained why she fought with the gunman by stating that she "just wanted [her] phone back." She said the next thing she remembered after being knocked to the ground was Gee helping her to her feet as the gunman fled toward the apartment complex carrying her purse. Afterwards, Gee and her two other friends scuffled with Knight.

Jewett testified that, in addition to her blackberry phone, the gunman took her purse, valued at $800, and her $700 digital camera, which was in the purse. Jewett identified photographs of the injuries she received in the robbery, which were admitted as exhibits and published to the jury.

On cross-examination, Jewett testified that the fight that took place after the robbery was mainly between Knight and Gee and started because Gee was angry at Knight for setting them up. She cancelled her credit and debit cards when she got home, but she did not immediately call the police because she was afraid that she would get in trouble for her illegal drug activity. She changed her mind, however, at 10:00 or 11:00 a.m. that morning after noticing an unauthorized charge on her debit card, which had been made within ten minutes of the robbery.

Kenneth Gee corroborated Jewett's account of the telephone call she received from Knight to arrange the Xanax purchase and of Knight's having later changed the meeting place from Kroger to the apartment complex. He testified that after Knight walked up to Jewett's driver's window to tell her that he was short of cash, an African-American man "came out of nowhere" and placed a gun to Jewett's head. Gee said he wanted to be ready to flee so he started slowly removing his seatbelt. The gunman saw him and reached behind Jewett's head, placed the gun to his neck, and ordered him not to move. In response, he raised his hands over his head and froze. Gee later explained that he was frightened and thinking to himself that he did not want "to die over some pills."

Gee testified that when Jewett's cell phone rang, the gunman grabbed it and took a step back from the vehicle. He said that Jewett got out of the vehicle to get her phone back and that he got out as well and started to circle around the back of the vehicle. He stated that he saw the gunman strike Jewett and Jewett fall to the ground. As he ran to help her, he saw the gunman fleeing with her purse.

Gee testified that he helped Jewett to her feet and then turned around to see Knight approximately twenty feet behind Jewett's car "just standing there watching the whole thing." Knight started toward him, and he advanced to meet him and began fighting. On cross-examination, Gee explained that he did not think about the gunman at that point because his "adrenaline was flowing" and that he was angry at Knight for having set them up.

Jacob Knight testified that on the morning of the robbery, he and the defendant were at the defendant's sister's apartment at the Riverside Apartment Complex making plans to rob someone. Their first plan, which involved a different victim, "didn't go through," so he suggested Jewett as a potential victim and the defendant agreed. Knight said that the

defendant was beside him as he called Jewett to arrange their meeting and that the defendant gave him a small amount of money when Jewett arrived at the complex. He stated that he walked up to Jewett's driver's side window and attempted to stall her by telling her that he was short on funds. A few seconds later, the defendant came up to Jewett's window armed with a black gun, and Knight backed away from the vehicle and watched the rest of the robbery from a distance of about ten feet. Although it was dark, he was able to see the defendant point his gun at Jewett and then "snatch the purse" before fleeing the scene. He also saw Jewett grab for the defendant's gun at one point during the robbery. Knight said that he did not know that the defendant had a gun with him at the Riverside Apartment Complex until he saw him point it at Jewett.

Knight testified that he got into a scuffle with Jewett's three friends after the robbery but that they and Jewett eventually left the complex. Afterwards, he met back up with the defendant at his sister's apartment and then drove the defendant home. En route, they stopped at a service station where the defendant used one of Jewett's credit cards to fill Knight's gas tank. Knight said he stopped again on his own way home to use another one of the credit cards to purchase cigarettes and a sports drink. On cross-examination, he testified that he had entered an open plea to facilitation of aggravated robbery and aggravated assault for his role in the crimes and had not been promised anything by the State with respect to his sentencing.

Clarksville Police Detective Michael Ulrey identified a written statement he took from the defendant on February 12, 2010, which was admitted as an exhibit and read aloud to the jury. In the statement, the defendant claimed that the robbery had been Knight's idea, that the gun was Knight's, and that Knight had accidentally shot a hole in his apartment wall with the gun earlier in the evening. His statement reads in pertinent part:

> My girl came down [after Knight shot a bullet into her apartment wall] & said she wanted me to leave so I went with him. He was supposed to be taking his friend his gun back & we ended up on Riverside. My little sister lives there so I went over there. [Knight] told me if I let him hold $12 he would give me $200 back in a bit. He called some girl & told her to sell him some pills. We was waiting & he said she would be there in a minute[,] come outside with him. We go outside & he hands me the gun & told me to watch his back. I gave him the clip & went over with him. I didn't hear the conversation but for some reason he decided he was gonna take her pills from her. So I'm standing there & he said if I wanted my money I had to get it back from her. He was already high & I have no idea why I went along but I did. I was holding the gun & he was beside me yelling at them. She jumped out & he told me they had a gun so I panicked & hit her. There was 3 other people in the car & they

-4-

all got out. [Knight] said grab that purse. I grabbed it & ran. They beat him up & he went back to the Apt. We left & he was looking thru the purse & found the credit cards. He filled up his tank & took me home. The next afternoon he came over & gave me the camera, phone, & purse. I kept the camera, told him I just got a new phone & didn't need it & thr[ew] the purse in the closet. Haven't heard from [Knight] since.

Detective Ulrey testified that during a search of the defendant's home he found the victim's purse and digital camera, which appeared to contain photographs of the defendant's family. On cross-examination, he acknowledged that he also found what appeared to be a bullet hole in the wall of the defendant's home. He said he did not find the victim's wallet or credit cards or any weapon in the home.

The defendant elected not to testify and rested his case without presenting any proof.

## ANALYSIS

### I. Racial Composition of Jury Panel

As his first issue, the defendant contends that he was denied his constitutional right to a jury of his peers. Asserting that only two or three of his venire members were African-American whereas African-Americans comprised 19.18 % of the population of Montgomery County as of the 2000 United States Census, he argues that "the lack of a fair and reasonable number of African Americans in the jury panel clearly indicates that a systematic exclusion of his race . . . occurred." The State responds that the defendant failed to make out a prima facie case of systematic exclusion because he did not offer any proof that there was an unfair representation of African-Americans in the venire or that a statistically significant disparity occurred in the selection process. We agree with the State.

Although a defendant has no right to a jury composed in whole or in part of members of his own race, Powers v. Ohio, 499 U.S. 400, 404 (1991), "[s]election of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial." State v. Bell, 745 S.W.2d 858, 860 (Tenn. 1988) (citing Taylor v. Louisiana, 419 U.S. 522 (1975)). To determine if a defendant has been denied his constitutional right to a venire comprised of a fair cross-section of the community, Tennessee applies the three-pronged test set forth in Duren v. Missouri, 439 U.S. 357, 364 (1979). State v. Mann, 959 S.W.2d 503, 535 (Tenn. 1997). Thus, to establish a prima facie violation of the fair cross-section requirement, the defendant must show:

"(1) that the group alleged to be excluded is a 'distinctive group' in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this [under]representation is due to systematic exclusion of the group in the jury-selection process."

Bell, 745 S.W.2d at 861 (quoting Duren, 439 U.S. at 364).

We agree with the State that the defendant has failed to make a prima facie case of a violation of the fair cross-section requirement. After the jury was impaneled, defense counsel moved "to get the racial makeup of the jury on the record." He conceded, however, that he was not raising any objection to the jury panel and that he currently had no appealable issue. The trial court, therefore, denied his request. At the subsequent hearing on the motion for new trial, defense counsel asserted that there had been "at most three African Americans" in the venire and that "[n]o one of [the defendant's] race ever even made it into the box." Based on these assertions, defense counsel argued that the defendant was denied his constitutional right to a jury of his peers. However, as the State points out, there is nothing in the record, apart from counsel's assertions, to show the number of African-Americans in the venire or that any alleged underrepresentation was due to a pattern of systematic exclusion of African-Americans in the jury selection process. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## II. Sufficiency of the Evidence

The defendant also challenges the sufficiency of the evidence in support of his convictions. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme

court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, aggravated robbery is defined as the intentional or knowing theft of property from the person of another by violence or putting the person in fear that is accomplished with a deadly weapon. Tenn. Code Ann. § 39-13-402(a)(1) (2010). The defendant relies on his own statement to police to argue that the evidence supports a conviction for facilitation of aggravated robbery rather than aggravated robbery. There was proof, however, that the defendant demanded Jewett's property at gunpoint, struck her in the face and neck when she resisted, and fled the scene with her purse, telephone, digital camera, and wallet. The evidence, therefore, when viewed in the light most favorable to the State, is sufficient to sustain the defendant's conviction for aggravated robbery.

For the purposes of this case, aggravated assault occurs when a person intentionally or knowingly causes another to reasonably fear imminent bodily injury and uses or displays a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(B) (2010). The defendant argues that the evidence is insufficient to sustain his aggravated assault conviction because there was "no proof that Mr. Gee was in reasonable fear of imminent bodily injury." In support, he cites the fact that Gee fought Knight after the robbery without consideration of whether the gunman might be lurking nearby. Gee testified, however, that he was in fear for his life when the gunman placed his gun against his neck and ordered him not to move. The evidence, therefore, when viewed in the light most favorable to the State, is sufficient to sustain the defendant's conviction for aggravated assault.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE