IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs January 17, 2018

## STATE OF TENNESSEE v. LESANDRU DENIESH WEBSTER

**Appeal from the Circuit Court for Maury County**
No. 23722    Russell Parkes, Judge

_____

### No. M2017-00939-CCA-R3-CD
_____

Defendant, Lesandru Deniesh Webster, was convicted of aggravated robbery and especially aggravated kidnapping. She received an effective sentence of thirty-five years and six months. On appeal, Defendant argues that she was denied her right to a jury selected from a fair cross-section of the community and that the evidence was insufficient to support her convictions. After review, we hold that Defendant is not entitled to relief. The judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Wesley Mack Bryant, Columbia, Tennessee, for the appellant, Lesandru Deniesh Webster.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Brent Cooper, District Attorney General; and Kyle Dodd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

A Maury County Grand Jury indicted Defendant for aggravated robbery, conspiracy to commit aggravated robbery, especially aggravated kidnapping, and possession of a firearm by a felon. Jury selection for a trial on those charges began in early December of 2015.

Prior to voir dire of the venire jury, Defendant raised an issue with the composition of the jury pool. Defendant argued that the percentage of African-Americans in the jury pool was not an accurate reflection of the population of Maury County. Defendant argued that there was only one African-American in the jury pool and Maury County's population is approximately twelve percent African-American. The clerk explained that the names from the jury pool are derived from the Tennessee Department of Safety's list of people with valid driver's licenses. From that list, a computer randomly selects the members of the jury pool. Around 650 to 700 jurors were summoned for a four month term of jury service. Those jurors are then randomly placed on the grand jury and twelve-member panels. Five or six of those panels are called to make up venire juries for the trials that take place during a specific term. For this case, six panels were called. After questioning the clerk, the trial court found that "the composition of this particular jury, the petit jury, has in fact been randomly selected."

Once the jury issue had been put on the record, the State moved the trial court to enter a nolle prosequi regarding the conspiracy to commit aggravated robbery and felon in possession of a firearm charges. Subsequent to that motion, the trial began. The State's proof consisted of five witnesses who testified to a largely consistent version of the facts. The following narrative is derived from their testimony.

Defendant and Britni Jones were in an off-and-on romantic relationship for approximately six months leading up to July of 2014. At that time, they were residing at Kayla Anderson's house on Nowlin Court in Columbia, Tennessee. Ms. Jones's children resided with them. On July 19, 2014, Ms. Jones asked Defendant to arrange for a person, later identified as Robert Greer, to bring marijuana to the residence of Stephen Johnson, their neighbor. In the evening on July 19th, Mr. Johnson encountered Defendant in the parking lot at Nowlin Court. Defendant approached Mr. Johnson and told him that Ms. Jones was going to meet a man at Mr. Johnson's house, watch a movie, and get drunk with him. Defendant further told Mr. Johnson that she was going to come into the house and rob them. In the moment, Mr. Johnson did not stand up to Defendant because he was scared of her.

When Ms. Jones got to Mr. Johnson's house, she spent some time with Mr. Johnson and his girlfriend, Brianna Boshers, before Mr. Greer arrived. Upon Mr. Greer's arrival, Ms. Jones asked if he had any marijuana. Mr. Greer said he didn't bring any marijuana, but he brought alcohol. The group—Ms. Jones, Mr. Johnson, Ms. Boshers, and Mr. Greer—sat on the couches in Mr. Johnson's living room and watched television. At some point, Ms. Jones got up from her seat to pour everyone a cup of alcohol. As she was doing so, an intruder came through the back door wearing a camouflage jumpsuit or coveralls and a mask over their face while holding a gun. Ms. Jones testified that the intruder told everyone to "[p]ut our hands up, get on the ground, empty our pockets, [and]

give them everything we had." Everyone complied with the intruder's demands, including Mr. Greer, who removed his wallet and cellphone from his pockets. Then, the intruder ordered everyone to get inside the bathroom.

The intruder asked, "[D]oes anybody have a debit card?" Mr. Greer indicated both the debit card and the wallet belonged to him. When asked by the intruder how much money was on his debit card, Mr. Greer said, "$80 or $100 or so." The intruder then instructed Mr. Greer and Mr. Johnson to get inside Mr. Johnson's car, a gold Mercury Sable. Fearing for his life because the intruder was pointing a gun at him, Mr. Greer complied with the intruder's commands. Mr. Johnson drove the car to a store named Sky Mart. At the store, the intruder instructed Mr. Johnson to withdraw money using Mr. Greer's debit card. The intruder asked Mr. Greer for his PIN, and Mr. Greer told Mr. Johnson his PIN. Mr. Johnson retrieved $80 from the ATM in the store and gave the cash to the intruder. They returned to Nowlin Court, and the intruder let Mr. Greer leave after taking his gold necklace. Mr. Johnson remained in the car with the intruder. Mr. Greer estimated that the value of his cellphone, necklace, and cash was $900.

Ms. Boshers and Ms. Jones remained inside the bathroom until Mr. Johnson returned to the house and opened the door. At this point, Defendant was with Mr. Johnson. Defendant was wearing the same clothing as the intruder, a camouflage jumpsuit or coveralls. According to the testimony of Ms. Jones and Ms. Boshers, Defendant was the intruder. Ms. Jones knew that the intruder was Defendant "when she came through the door" because she recognized Defendant's voice. When Ms. Jones and Defendant returned to their residence, Ms. Jones confronted Defendant about what had happened. An argument ensued, but Defendant eventually told Ms. Jones about going to an ATM with Mr. Johnson and Mr. Greer and withdrawing some money. Later, Ms. Jones recognized a BB gun that one of Ms. Anderson's children was playing with as the gun that had been used by Defendant during the commission of the crime. However, Ms. Jones did not call the police to report Defendant because she was in a relationship with Defendant and she feared Defendant.

After leaving Nowlin Court, Mr. Greer stopped at a convenience store and had an employee of the store call the police of his behalf. Once the police arrived, they interviewed Mr. Greer. A few days later, Corporal Jason Dark of the Columbia Police Department was assigned to this case and began his investigation at Sky Mart, a gas station in Columbia, Tennessee. He was looking for footage depicting a gold car and a white male during the time frame of the crime. At the gas station, Corporal Dark retrieved video footage showing a "gold four-door Mercury with a dent on the right passenger door." He then issued a "be on the lookout" or "BOLO" for the vehicle in the video footage. In response to a fellow police officer sighting a vehicle matching the description in the BOLO, Corporal Dark drove to Nowlin Court and saw a "Mercury

Sable four-door, gold [that] had a dent on the passenger rear door." He discovered that the vehicle belonged to Steven Johnson who resided at 208 Nowlin Court, the location of the robbery that Corporal Dark was investigating.

Corporal Dark conducted interviews of Mr. Johnson, Ms. Boshers, and Ms. Jones. After his interview with Ms. Jones, he filed charges against her. As a result of these interviews, Corporal Dark determined that Defendant, also known as Precious, was a person of interest. Eventually, Defendant was arrested pursuant to a warrant, and Corporal Dark Mirandized and interviewed her. When asked about the robbery in the interview, Defendant claimed to have known about a plan for the robbery but maintained she did not participate. When testifying about the interview, Corporal Dark stated, "[Defendant] refused to tell me where she was the night of the robbery. Just said, I was around. I've been at a lot of places. But wouldn't tell me an exact location."

It should be noted that Ms. Jones admitted that she was not truthful when she first spoke with the police. At that time, she claimed that she did not know anything about the crime. After talking with the police for a while, she finally told them a less than truthful account of what had happened. Specifically, Ms. Jones admitted that she was not telling the truth when she told the police that Defendant had informed her of Defendant's intent to rob Mr. Greer before the crime took place. Mr. Johnson revealed that he had brain injuries that impaired his memory. Additionally, Mr. Johnson's account of the events that took place on July 19, 2014, is different. Mr. Johnson recounted arriving back at Nowlin Court with Mr. Greer and the intruder, and then going straight to his house to go to bed. When specifically asked if he talked to Ms. Boshers about what had happened when he returned, Mr. Johnson replied, "No. Like I said, it scared me. So[,] all I did was [go] straight to my room to bed." On a related note, Mr. Greer did not know the gender of the intruder, and he admitted that his statement continually referred to the intruder as male.

The Defendant chose to testify. She claimed she had nothing to do with the robbery and kidnapping. According to Defendant, all of the other witnesses lied. Defendant recounted ending her relationship with Ms. Jones in early July of 2014. Defendant confronted Ms. Jones about "house hopping" with Ms. Jones's children and suggested the children stay with their grandmother, Defendant's mother, temporarily. Defendant's brother is the father of Ms. Jones's children. According to Defendant, Ms. Jones did not take her suggestion very well.

About one week before the incident that is the subject of this case, Defendant had another encounter with Ms. Jones. Defendant described Ms. Jones's begging her for financial help because Ms. Jones's car was going to be repossessed and Ms. Jones was about to lose her food stamps. Ms. Jones told Defendant that she and her children were sleeping on the floor at Ms. Anderson's house. Defendant told Ms. Jones to place her

children in Defendant's mother's custody in order to ease her financial burden. Defendant remembered Ms. Jones becoming hostile and saying, "You're selfish. You know what your family [has] put me through. You know that she had tried to take my kids from me since they was born. You don't care about anything that we're going through."

Defendant recounted Ms. Jones's explaining a plan that detailed how she and Justin Belafont, or "Bleach," would rob a person. The plan entailed Ms. Jones contacting a man on Facebook, the man meeting Ms. Jones, and Mr. Belafont "[doing] the rest." According to Defendant, Ms. Jones and Mr. Belafont's first attempt to execute this plan failed, but Mr. Belafont wanted to attempt it again. Defendant admittedly reacted aggressively to hearing this. She described her reaction as "verbal aggression," and testified, "I did call her out. . . . I remember calling her stupid. . . . I asked her if she realized how dangerous the situation [sic] she put herself in. I told her that she was a very unfit mother and that I was going to let my mama know that she needed to get the kids as soon as possible." That was the end of their conversation. A few nights later, Defendant spoke with Ms. Anderson and found out about the incident that is the subject of this case. Ms. Anderson told her, "[Ms. Jones] and [Mr. Belafont] had set up a robbery at her house." The next day, Defendant found out that she had been implicated in the crime.

Defendant contacted her parole officer once she knew that the police were looking for her. Defendant was on parole for selling crack cocaine approximately five years before the events of this case. During a conversation with her parole officer, Defendant asked if she could "come forward without being arrested . . . [and] explain my side of the story . . . ." The parole officer explained that if Defendant came forward, she would be arrested. This prompted Defendant to go to Lewisburg and stay with her friend. More than a week later, Defendant was arrested.

Defendant was Mirandized and interviewed by Corporal Dark. Defendant described being very upset that she had been falsely accused and that she had not been notified of the warrants out for her arrest. Defendant testified, "I did let him [Corporal Dark] know that I was upset about that and that I did not wish to talk to him at that time." In the interview Defendant said, "I have heard about what you are discussing with me. But what I'm telling you is I had nothing to do with it."

After hearing all of the evidence, the jury found Defendant guilty of aggravated robbery and especially aggravated kidnapping. Subsequently, Defendant received concurrent sentences of sixteen years and six months for aggravated robbery and thirty-five years and six months for especially aggravated kidnapping. Defendant filed a motion for new trial that was denied by the trial court. This timely appeal followed.

*Analysis*

On appeal, Defendant argues that the trial court erred when it allowed a petit jury to be empaneled when the venire jury contained only one African-American person, thereby denying Defendant her right to a jury chosen from a fair cross-section of the community. Additionally, Defendant challenges the sufficiency of the evidence. Defendant concedes that she lacks proof of systemic exclusion of African Americans from the venire jury. The State maintains that Defendant's concession defeats her claim pertaining to her right to a jury chosen from a fair cross-section of the community and that the evidence was sufficient to support her conviction. We agree with the State.

## I. Jury Composition

"A criminal defendant has a constitutional right to a jury drawn from a venire that represents a fair cross-section of the community." *State v. Brandon M. Cartwright*, No. W2010-1253-CCA-R3-CD, 2011 WL 2410370, at *4 (Tenn. Crim. App. June 10, 2011) *perm. app. denied* (Tenn. Oct. 18, 2011). "Selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial." *State v. Bell*, 745 S.W.2d 858, 860 (Tenn. 1988) (citing *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975)). A defendant has "'the right to be tried by a jury whose members are selected by nondiscriminatory criteria,'" but he or she does not have a "right to a petit jury composed in whole or in part of persons of the defendant's own race." *Powers v. Ohio*, 499 U.S. 400, 404 (1991) (quoting *Strauder v. West Virginia*, 100 U.S. 303, 305 (1880)). To determine whether a jury was properly selected from a fair cross-section of the community, Tennessee applies the three-pronged test in *Duren v. Missouri*, 439 U.S. 357, 364 (1979). *See Cartwright*, 2011 WL 2410370, at *4 (citing *State v. Buck*, 670 S.W.2d 600, 610 (Tenn. 1984)). The *Duren* test requires that a defendant show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
>
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such person in the community; and
>
> (3) that this underrepresentation is due to systematic exclusion of the group in the jury process.

*Duren*, 439 U.S. at 364.

- 6 -

African-Americans are a "distinctive" group. *State v. Hester*, 324 S.W.3d 1, 42 (Tenn. 2010). In this case, the evidence showed that Maury County's methodology for choosing venire juries resulted in one African-American out of the seventy-two members on the venire jury. So, roughly one percent of the venire jury was African-American. According to the unsupported statement of defense counsel, Maury County's population is approximately twelve percent African-American. Even if we were to assume that the underrepresentation prong of the *Duren* test were satisfied, Defendant concedes that she fails to satisfy the systematic exclusion prong of the test. Defendant admits "she is without any proof or information that selection of jury pools via the above referenced method systematically excludes and/or excluded African-Americans from jury pools in Maury County." Defendant has conducted an accurate self-assessment of her claim. There is no evidence in the record that Maury County's system of selecting jurors, which uses a computer to randomly select members of the jury pool from the Tennessee Department of Safety's list of people with valid driver's licenses, systematically excludes African-Americans. Accordingly, Defendant has failed to establish that her right to be tried by a fair cross-section of the community was violated.

## II. Sufficiency of the Evidence

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992) (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

Defendant challenges the State's proof of her identity by arguing that the only witnesses to identify her as the intruder were accomplices to the crime. "The identity of the perpetrator is an essential element of any crime." *State v. Robert Wayne Pryor*, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. Apr. 19, 2005) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)), *no perm. app. filed*. The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." *Id.* (citing *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. *Thompson*, 519 S.W.2d at 793. The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1994) (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

"A conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 46 S.W.3d 689, 696-97 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). However, only slight corroboration is required. *See Hawkins v. State*, 469 S.W.2d 515, 520 (Tenn. Crim. App. 1971). The rule set forth by our supreme court is as follows:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963). Because accomplices cannot corroborate each other, cases involving multiple accomplices require additional corroboration. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001) (citing *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995)).

The test to determine whether one is an accomplice is whether the alleged accomplice can be indicted for the offense. *Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). An accomplice is "one who knowingly, voluntarily, and with

common intent with the principal unites in the commission of a crime." *State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014). If the facts raise a question at to whether a person is an accomplice, it is a question of fact for the jury's determination. *State v Kimberly Mangrum*, No. M2009-01810-CCA-R3-CD, 2011 WL 5387594, at*5 (Tenn. Crim. App. Nov. 9, 2011), *aff'd*, 403 S.W.3d 152 (Tenn. 2013).

In this case, the trial court made no determination that any of the witnesses were an accomplice by law. Instead, the trial court instructed the jury to determine if any witness was an accomplice as a matter of fact using the Tennessee Pattern Jury Instruction on accomplice testimony. The jury was instructed that the testimony of an accomplice must be corroborated and that the corroborating testimony cannot originate from another accomplice. The trial court concluded by saying, "If you find from the proof that the witness was an accomplice, then the Defendant can not [sic] be convicted upon the uncorroborated testimony of this witness. If you find that the witness was not an accomplice, then you will judge the weight to be given to his or her testimony just as you do that of the other witness[es] in the case."

Giving the State the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn therefrom, a rational juror could find that Ms. Boshers was not an accomplice. Defendant argues that Ms. Boshers "agreed to have [her] residence be the scene of the crime." However, there is no indication that Ms. Boshers consented in any way to the commission of the crime in her home. There is nothing in the record indicating that Ms. Boshers knew of a plan to rob Mr. Greer or that she encouraged or helped with the robbery. None of the witnesses who may have had some knowledge of the impending robbery testified about discussing it with Ms. Boshers. In fact, Ms. Boshers stated it was a "surprise" to her and she was scared. We reject Defendant's contention that Ms. Boshers's failure to call the police makes her an accomplice as this would transform every victim and witness who fails to report a crime into an accomplice. There was nothing in the record that would lead a rational juror to determine that Ms. Boshers "knowingly, voluntarily, and with common intent" united with Defendant to commit the robbery and kidnapping. Thus, her identification of Defendant as the intruder would not need corroboration because she was not an accomplice. Additionally, if the jury determined that Ms. Jones and Mr. Johnson were accomplices due to their earlier discussions with Defendant regarding the robbery, Ms. Boshers's testimony would provide sufficient corroboration identifying Defendant as the intruder. A rational juror could find beyond a reasonable doubt that Defendant was the intruder.

The remaining statutory elements of the crimes committed were established by the testimony of all of the witnesses. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). A robbery "[a]ccomplished with a deadly weapon or by display of any

article used or fashioned to lead the victim to reasonably believe it is a deadly weapon" is an aggravated robbery. T.C.A. § 39-13-402(a)(1). Especially aggravated kidnapping is false imprisonment "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A § 39-13-305(a)(1). False imprisonment is occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a).

Viewed in a light favorable to the State, the evidence shows that Defendant barged into Mr. Johnson's residence brandishing a firearm or a BB gun that appeared to be a firearm. She ordered everyone to get on the ground and took at least Mr. Greer's wallet and phone. Then, she forced Mr. Johnson, Ms. Jones, Ms. Boshers, and Mr. Greer into the bathroom of the house. She removed Mr. Greer and Mr. Johnson from the bathroom, forced him into a car at gunpoint, and took him to a convenience store. Next, she forced Mr. Johnson to retrieve money from Mr. Greer's debit card at the ATM. Prior to letting Mr. Greer leave upon their return to Nowlin Court, she also took his gold necklace.

A rational juror could find beyond a reasonable doubt that Defendant committed aggravated robbery when she intentionally or knowingly took the property of Mr. Greer by violence or putting him in fear and accomplished this by using either a deadly weapon or a BB gun that the victim reasonably believed to be a deadly weapon. A rational juror could also find beyond a reasonable doubt that Defendant committed especially aggravated kidnapping when she knowingly confined Mr. Greer to the bathroom or the car, substantially interfering with his liberty, and accomplished this by using either a deadly weapon or a BB gun that the victim reasonably believed to be a deadly weapon. The evidence is sufficient for both of Defendant's convictions.

*Conclusion*

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE